Argued June 24; affirmed July 15; rehearing August 11;
reversed August 19, 1948

# SPRAGUE *v.* FISHER ET AL.

197 P. (2d) 662, 203 P. (2d) 274

In Banc.

*William E. Dougherty* and *Roy F. Shields,* both of Portland, argued the cause for appellant. On the brief were Maguire, Shields, Morrison & Bailey, and James G. Smith and William E. Dougherty, of Portland.

*George Neuner,* Attorney General, and *Dean Ellis,* Assistant Attorney General, of Salem, argued the cause and filed a brief for respondents.

BRAND, J.

This is a test case brought by the plaintiff, as a citizen and taxpayer, in which he seeks to restrain the Tax Commission from an alleged improper diversion of funds derived from collections under the provisions of the Personal Income Tax Law of 1929, (O. C. L. A., § 110-1601) as amended, which is cited as the Property Tax Relief Act of 1929, and under the Excise Tax of 1929, (O. C. L. A., § 110-1501) as amended. Upon the filing of the complaint and answer, the plaintiff and defendants each moved for judgment on the pleadings in accordance with their respective prayers. The case is here upon appeal from a decree of the Circuit Court dismissing the suit.

The Personal Income Tax Law, cited as the Property Tax Relief Act of 1929 as amended, and the Corporation Excise Tax of 1929 as amended, each impose taxes on incomes. Both statutes have been referred to as the "Property Tax Relief Acts" because they provide for the application of certain revenues derived therefrom to the reduction of taxes which would otherwise be levied on property. Without summarizing the pleadings separately, we shall set forth as facts the undenied allegations of the respective parties. The estimated balance as of June 30, 1948, of receipts from the taxes imposed by said Property Tax Relief Acts, plus estimated receipts from those sources during the fiscal year 1948-1949, all of which are to be considered in preparing the state tax levy for the fiscal year 1948-1949, total about $81,000,000.

Article XI, section 11 of the Oregon Constitution was adopted by vote of the people in 1916. As amended in 1932 it provides in part as follows:

"Unless specifically authorized by a majority of the legal voters voting upon the question neither

the state nor any county, municipality, district or body to which the power to levy a tax shall have been delegated shall in any year so exercise that power as to raise a greater amount of revenue for purposes other than the payment of bonded indebtedness or interest thereon than the total amount levied by it in any one of the three years immediately preceding for purposes other than the payment of bonded indebtedness or interest thereon plus 6 per centum thereof; provided * * *''

The items of expense to which the state will be subject for the fiscal year 1948-1949, which will be taken into consideration by the Commission in preparing the state tax levy for such fiscal year, total approximately $38,200,000 divided as follows:

(1) General expenses inside 6% limitation ............................................$19,000,000

(2) Levies authorized by vote of people outside 6% limitation ....... 19,200,000

If the state tax levy for 1948-1949 should be prepared in accordance with the plaintiff's contentions and on the basis which the plaintiff asserts has been heretofore employed by the Commission, the situation could be summarized as follows:

|  |  | Inside 6% Limitation | Outside 6% Limitation |
|---|---|---|---|
| (a) | State expenses for which levy is to be made | $19,000,000 | $19,200,000 |
| (b) | Miscellaneous receipts | 6,000,000 | |
|  |  | $13,000,000 | $19,200,000 |
| (c) | Revenue from property tax relief acts to be applied "inside" and "outside" limitation | 7,137,671.51 | 19,200,000 |

(d) Balance for which a tax cannot be levied without authorization by the people but which, if so authorized, would be offset by application of revenues from property tax relief acts    5,862,328.49    ---------------

In addition to the foregoing expenses, Oregon Laws, 1947, chapters 466 and 439, also provide for a distribution (which will be about $3,200,000) to the state and county school fund for local property tax relief.

The various figures in the summary, as submitted by the plaintiff, require the following explanations: O. C. L. A., § 110-533, as amended by Oregon Laws 1941, chapter 440, imposes upon the State Tax Commission the duty in July of each year to ascertain by computation and estimate, the total amount of revenue necessary for the current fiscal year, and to apportion such total revenue among the several counties. O. C. L. A., § 110-534 as also amended by Oregon Laws 1941, chapter 440, provides as follows:

"The state tax commission shall proceed as follows:

"1. Prepare a tabulated statement, consisting of all the items of expense, given separately, to which the state will be subject under existing laws for the fiscal year next after that year or period for which the last preceding apportionment of state revenues was computed and declared; also all items of deficiency, including interest on unpaid warrants left over from the previous year, the payment of which has been authorized by law; and also when such apportionment is made on the assessment of an

even year, the estimated expense of one biennial session of the legislative assembly; and also when such apportionment is made on the assessment of an even year, such additional amount or amounts as the governor may deem necessary to meet the expenses of the state for the fiscal year.

"2. From the sum total of the aforesaid items shall be deducted any surplus or estimated surplus remaining in the state treasury from all funds, *however derived, if not applied by law to some special purpose.*

"3. The remainder so obtained shall be the total amount of revenue to be raised for state purposes for the current fiscal year, and such remainder shall be apportioned among the several counties in the manner hereinafter provided.

"4. The total amount of revenue to be raised for state purposes for the current fiscal year, ascertained and determined as above provided, shall be apportioned among and charged to the several counties in that proportion which the total value of all the taxable property in each county bears to the total value of all the taxable property of the state as equalized and certified to the secretary of state by the said state tax commission.

"5. Immediately after the said commission has completed the ascertainment of the total amount of revenue necessary to be collected for state purposes, as aforesaid, and apportioned the same among the several counties as heretofore provided, a certificate thereof shall be signed by the chairman and secretary of the commission, authenticated by the official seal of the commission, and shall be delivered to the secretary of state, and a similar certificate shall be filed in the office of said commissioner. [L. 1941, c. 440, § 19.]" O. C. L. A., § 110-534.

These provisions, so far as they affect the present issue, have remained substantially the same since

originally enacted by the Laws of 1885, pages 135-136.

In the above summary the two items under (a) totaling $38,200,000 represent the sum total of the items of expense computed in accordance with the provisions of sub-paragraph (1) of O. C. L. A., § 110-534 as amended, which is set forth, supra. Under (b) in the summary, miscellaneous receipts are set forth as $6,-000,000. The authority for deducting miscellaneous receipts is found in sub-paragraph (2) of O. C. L. A., § 110-534 as amended, which requires the deduction from the total of expense items of any surplus or estimated surplus remaining in the state treasury ''from all funds, however derived, if not applied by law to some special purpose.''

Plaintiff and defendant are in sharp disagreement as to the meaning of sub-paragraph (2), the defendant contending that the present and estimated surplus or ''miscellaneous receipts'' pursuant to O. C. L. A., § 110-534 remaining in the state treasury from all funds, however derived, and not applied by law to some special purpose, is greatly in excess of the $6,-000,000 item set forth in plaintiff's summary and is in fact at least $20,000,000. The items in (c) of the summary are not in controversy. Under the six per cent limitation, the tax base for the fiscal year 1947-1948 as computed in the state tax levy was $6,733,652.37. Adding to that tax base an additional six per centum thereof we reach a total of $7,137,671.51 which is the item shown in paragraph (c) of the summary as the revenue from Property Tax Relief Acts to be applied inside the six per cent limitation. The item $19,200,000 is, as stated in paragraph (c) of the summary, the revenue from Property Tax Relief Acts which is to be

applied against state expenses which have been authorized by the people and are outside of the six per cent limitation. Plaintiff refers to the balance of $5,-862,328.49 shown in paragraph (d) of the summary as a deficit which he asserts "accrues because the revenues available within the six per cent constitutional limitation plus estimated miscellaneous receipts will be insufficient to meet the requirements of appropriations for which the Commission is required to levy a tax."

Oregon Laws 1947, chapter 477, provides that upon receipt before July 1, 1948 and subsequent consideration of the report of the Budget Director, the Board of Control shall make a determination as to the amount needed to meet necessary requirements and shall certify that amount to the State Tax Commission. Section 2 of that Act is as follows:

"At the time of making the apportionment of required state revenues for the fiscal year beginning July 1, 1948, the state tax commission shall make a finding as to whether or not the revenues available within the six per cent limitation imposed by section 11, article XI, of the constitution of Oregon, plus estimated miscellaneous receipts, are in an amount sufficient to meet the requirements of appropriations for which the commission is required to levy a tax, taking into account the determination and certification by the board of control of the amount needed to meet requirements for expenditures during the remainder of the biennium ending June 30, 1949, and the items referred to in subsection 1 of section 110-534, O. C. L. A., as amended. If the commission finds that said revenues, plus estimated miscellaneous receipts, are insufficient therefor it shall certify to the secretary of state that, to meet said requirements as determined and certified by the board of control, a necessity exists for levying

a tax in excess of the said constitutional limitation." Laws 1947, chapter 477, Section 2.

In section 3 of the Act it is provided that upon such certification the Secretary of State shall refer to the pepole of the State of Oregon the question of whether or not such levy in excess of the constitutional limitation shall be made. Section 4 is as follows:

"If the majority of the legal voters voting upon said question authorize such levy in excess of the limitations imposed by section 11, article XI, of the constitution, said levy shall be offset, as are other state taxes, by funds derived from taxes on or measured by net income." Laws 1947, chapter 477, Section 4.

In reliance upon that statute the plaintiff contends that it will be necessary for the people to authorize a levy outside of the six per cent limitation because the revenues available within the six per cent limitation plus estimated miscellaneous receipts will be insufficient by $5,862,328.49 to meet the requirements of appropriations for which the Commission must levy a tax. Plaintiff therefore seeks a mandatory injunction requiring the Tax Commission to make the finding required by Oregon Laws 1947, chapter 477, section 2, supra. The defendants on the other hand, contend that it will be unnecessary for the people to authorize a levy outside of the six per cent limitation and that therefore it would be improper for the Tax Commission to certify to the necessity for such an election under the provisions of chapter 477 of the Laws of 1947. The Commission challenges as incorrect, item (b) in the above summary which shows miscellaneous receipts at $6,000,000 and asserts that the amount of the present and estimated "surplus" or "miscellaneous" receipts pursuant to the provisions of O. C. L. A., § 110-534 is

at least $20,000,000. The Commission arrives at such amount by adding to the receipts from other sources in the amount of about $6,000,000, the balance of receipts from taxes under the Property Relief Acts which will remain after all specific legislative allocations to property tax relief have been satisfied.

The defendant Tax Commission contends that under O. C. L. A., § 110-534 as amended, there are funds which have been derived from the Property Tax Relief Acts which constitute a part of ''surplus or estimated surplus not applied by law to some special purpose'', as a result of which the surplus which is to be deducted from the sum total of expense items is sufficiently large to entirely eliminate the deficit of $5,862,328.49 and therefore to eliminate the necessity for the calling of any popular election for the purpose of authorizing a levy outside of the six per cent limitation.

The Personal Income Tax Law, known as the Property Tax Relief Act of 1929 as amended by the Laws of 1947, chapter 466, (§ 110-1637) provdies:

''All costs incurred in the administration of this act shall be paid out of the revenue from the tax imposed by this act and the net revenue from the tax, after deduction of said administrative costs, shall become a part of the general fund in the hands of the state treasurer. Such revenue, like that from other sources, shall be taken into account by the tax commission in making the annual levy for state purposes, but shall not affect the base for computing the limitation on such levy imposed by section 11, article XI, Oregon constitution. It is the expressed intention of this act that the net revenue derived from this tax shall be applied first to reduce the state tax levy on property inside the 6 per cent constitutional limitation and then to reduce the state levy on the property outside said constitu-

tional limitation. In the event that the revenue from this tax and the revenue from any other tax on or measured by net income for any fiscal year shall exceed the amount necessary to eliminate the state levy on property otherwise required to be paid into the state treasury by the several counties for such year, the remainder of such revenues shall be accounted in the state levy of taxes and applied as follows:

"(1) To reduce by corresponding amount the property tax otherwise to be apportioned to the several counties for the state elementary school fund, and the state treasurer hereby is directed to transfer such amount to an account in the general fund to be known as the state elementary school fund account. On or before October 15 of each fiscal year the secretary of state shall draw warrants on the state treasurer, payable to the treasurers of the several counties, for not less than one-half of the respective amounts apportioned in the state levy of taxes for payment from said state elementary school fund account; similarly, the secretary of state shall draw warrants on or before April 15 of such fiscal year covering the entire remainder of said account.

"(2) Next, from the remainder of such revenue, if any, the state treasurer shall transfer an amount not in excess of five million dollars ($5,000,000); provided, however, in each of the fiscal years 1945-1946 and 1946-1947 an amount not in excess of eight million dollars ($8,000,000) shall be so transferred to a fund in the state treasury to be known as the state school support fund, for apportionment as provided by law in reduction of property taxes otherwise to be levied for the support of the public elementary and high schools.

"(3) Next, the remainder of such revenues, if any, in an amount not exceeding five million dollars ($5,000,000), the state treasurer shall transfer to an account in the general fund to be known as the

property tax reduction account, to be applied in the state levy of taxes for the next ensuing fiscal year for the several purposes and in the order hereinbefore stated; provided, however, that in the event that that certain measure enacted by the forty-third legislative assembly of the state of Oregon, designated and introduced in such assembly as house bill No. 415 and which was referred to the people by said legislative assembly, shall not be approved by the people, then there shall be transferred to such account, in addition to the funds herein provided, in each of the fiscal years 1945-1946 and 1946-1947 the additional sum of five million dollars ($5,000,000).

"In the event that the amount in said property tax reduction account at the close of any fiscal year plus the estimated receipts from this tax and from any other tax on or measured by net income, as accounted in the state levy of taxes for the next ensuing fiscal year, shall exceed by not less than five million dollars ($5,000,000) the total amount required to offset all the aforesaid state taxes otherwise to be levied on property, including the tax for the state elementary school fund and the aforesaid transfer to the state school support fund for such fiscal year, together with the additional sums herein required to be transferred in each of the fiscal years 1945-1946 and 1946-1947 to the property tax reduction account, then the state treasurer shall transfer to a fund in the state treasury to be known as the state and county school fund any excess over the amounts heretofore specified up to an amount aggregating with other moneys in said fund, not more than ten dollars ($10) per capita for all children within the state between the ages of 4 and 20 years, as shown by the last preceding school census compiled and certified by the superintendent of public instruction, for apportionment as provided by law in reduction of property taxes otherwise to be levied for the county school funds of the several counties. In the event that at the end of any

fiscal year, the estimated receipts from this tax and any other tax on or measured by net income, required to be accounted for in the state levy of taxes for the ensuing fiscal year, shall exceed the aggregate of the amounts hereinbefore required to be transferred or accounted for, there shall be allowed upon tax returns for tax years beginning in the calendar year during which such excess is determined a discount of 5 per cent for each one million dollars excess or major part thereof; provided that in the case of fractional years, the discount shall be applied to the 12 months succeeding the beginning of the first such fractional year; and further provided, that no discount shall be determined for the calendar year 1947 or the calendar year 1948 or for fiscal years beginning within either of said calendar years."

The allocation to the state and county school fund will amount to about $3,200,000.

A provision in all respects substantially identical to the foregoing statute also appears in the Excise Tax Law, (O. C. L. A., § 110-1523) as amended by the Laws of 1947, chapter 439.

Following the language of the last sentence of the Property Tax Relief Act (Laws of 1947, chapter 466, supra), it may be said that the amount by which, at the end of the fiscal year, the estimated receipts from the taxes on or measured by net income, required to be accounted for in the state levy of taxes for the ensuing fiscal year, "shall exceed the aggregate of the amounts hereinbefore required to be transferred or accounted for", constitutes the surplus or estimated surplus, the use of which is in issue here. The statute provides for a normal absorption of such excess by discounts on income taxes but it will be observed that the excess will not be so absorbed for the present because "no discount shall be determined for the calendar year 1947

or the calendar year 1948 or for fiscal years beginning within either of said calendar years." Laws 1947, chapter 466.

For convenience, and without intending to beg the question at issue, we shall refer to the balance of revenues derived from taxes on net income after each specified application of funds has been made as required by Laws of 1947, chapter 466, as "income tax surplus".

The question at issue is whether such income tax surplus is included in "surplus or estimated surplus remaining in the state treasury from all funds, however derived," and not "applied by law to some special purpose." (Oregon Laws 1941, chapter 440, section 2). The unique circumstance in the controversy is found in the fact that both parties contemplate that the income tax surplus above described shall ultimately be used to pay the general expenses of the government as referred to in Laws of 1941, chapter 440, page 763, subparagraph (1). The difference between the parties lies in the fact that the Tax Commission considers that the income tax surplus is not earmarked as solely for use in the reduction of taxes on property, whereas the plaintiff contends that the income tax surplus represents something in the nature of a trust fund, which, however, can be relieved from the trust by means of a device. The proposed device is as follows: Let the Commission make a finding under the provisions of Oregon Laws 1947, chapter 477, supra, to the effect that the revenues available within the six per cent limitation plus estimated miscellaneous receipts are insufficient in amount to meet the requirements of expenditures in accordance with the certificate of the Board of Control. Then, further pursuant to the provisions of that statute,

let the Secretary of State refer to the people of the state of Oregon the question whether or not such levy in excess of the constitutional limitation shall be made. Next, let the people, at a special election, vote to impose a tax on property sufficient to meet the alleged deficit of $5,862,328.49, and when *and if* the people so vote, a tax on property will be levied and the income tax surplus will immediately be employed to offset the tax on property, whereupon the evanescent property tax will never be certified to the counties nor extended on any tax roll against any property. In substance, the contention is that a burden must be imposed upon property so that the burden may be removed and the income tax surplus funds used for general fund purposes.

It was contended before the trial court, but not seriously urged here that the application of income tax surplus to general fund purposes would violate the "spirit" of the six per cent limitation. If the statutes have not applied such surplus "to some special purpose" we see nothing in the six per cent limitation which prohibits the use of that surplus for general fund purposes. The power of the state to levy and collect taxes is not a delegated power. It is an inherent attribute of sovereignty. The power is subject only to such limitations as exist under the federal or state constitutions. *Brown v. City of Silverton,* 97 Or. 441, 190 P. 971; *Delaney v. Lowery,* 25 Cal. (2d) 561, 154 P. (2d) 674; *In re McKennan's Estate,* 25 S. D. 369, 126 N. W. 611.

" * * * The power of taxation being essential to government, and being usually confided in the largest measure to the legislative discretion, constitutional limitations upon its exercise will not be inferred or implied, but must be distinctly and positively expressed, * * *." 61 C. J., page 80.

In *Delaney v. Lowery,* supra, it was held that constitutional restrictions on the power of the legislature in the field of taxation must be strictly construed against the limitation. In the six per cent amendment we find no provision concerning the use to which funds raised by taxation may be put. The court should be reluctant to hold that the sovereign taxing power of the state can be confined by any unexpressed ''spirit of the constitutional limitation.''

Again, it is contended that the use of income tax surplus for general fund purposes violates Article IX, section 3 of the Oregon Constitution which provides in part, ''every law imposing a tax shall state distinctly the object of the same to which only it shall be applied.'' If the statute, properly construed, has applied the income tax surplus ''by law to some special purpose'', that ends the matter, so far as the administrative officials of the state are concerned, for, clearly the legislature may effectively provide that revenues shall be placed in a special fund to be used only for designated purposes, but if the statute has placed the income tax surplus in the general fund, free from any application to special purpose, then we are unable to see how Article IX, section 3 of the Constitution has any application to the pending controversy.

The authorities are in conflict as to the application of provisions similar to Article IX, section 3 of the Oregon Constitution. Some courts have held that the provision applies ''only to the ordinary and general taxes for state purposes and such as are imposed generally on all the taxable property in the state.'' Counsel for the plaintiff construes the quoted portion of Article IX, section 3 as containing two separable provisions; (a), a requirement that every tax act shall

state the object of the tax; (b), a prohibition against applying the tax to any other object. It is then argued that the cases cited by the defendants are not in point because they relate only to the first of the two provisions. Many of the cases cited by the defendant do hold that requirement (a) applies only to property taxes, but such decisions are nonetheless relevant under (b). The constitutional requirement is that the act shall state ''the object to which only it shall be applied.'' If the constitutional provision does not require that the statute ''shall state distinctly the object'' of the tax, then it would appear that prohibition (b) should not be construed to limit the application of funds to an object which need not be stated. Upon this issue, the argument of counsel for the plaintiff appears to beg the question. We quote from plaintiff's brief: ''The question here is not whether the legislature was required to state distinctly the object of the property tax relief act. The object was stated.'' If the object to which only the income tax surplus can be applied has been stated in the statute, and if the defendants threaten to divert that surplus from that object, then the statutory limitation would prevail without the necessity of invoking Article IX, section 3.

The following authorities support the defendant's contention that provisions similar to Article IX, section 3 apply only to general taxes on property: *In re Ford,* 6 Lans. (N. Y.) 92; *City of Glendale v. Betty,* 45 Ariz. 327, 43 P. (2d) 206; *Farmers Union Cent. Cooperative Exchange v. Director of Revenue,* 163 Kan. 266, 181 P. (2d) 541; *In re McKennan's Estate,* 25 S. D. 369, 126 N. W. 611; *In re McPherson,* 104 N. Y. 306, 10 N. E. 685; *McGannon v. State,* 33 Okla. 145, 124 P. 1063; but see *Ex parte Marler,* 140 Okla. 194, 282 P.

353; but see *State V. Oklahoma Tax Commission,* 191 Okla. 155, 127 P. (2d) 1052; *Brown v. Commonwealth,* 125 Ky. 402, 101 S. W. 321; *State v. Sheppard,* 79 Wash. 328, 140 P. 332; and see *City of Sheridan v. Litman,* 32 Wyo. 14, 228 P. 628.

From Cooley on Taxation we quote:

" * * * Such provisions may nevertheless prevent some abuses, and considerable importance has been attached to them. But the purposes of government are so infinite in variety that the specification must for the most part be very general, or the constitution could not be complied with; and it has been held that a statement in a tax law, that the money to be raised is to be paid into the treasury to the credit of the general fund, is a sufficient compliance with the requirement. The same ruling was made where the statement was that the moneys raised should be applicable to the payment of the ordinary and current expenses of the state, and also where an act in taxing a railroad appropriated part of the taxes to the payment of the bonds issued in aid of the road. The provision applies only to annually recurring taxes, and taxes imposed generally upon the entire property of the state, and is not applicable to succession taxes upon legacies, or to local county taxes, or to laws authorizing the citizens of towns to impose taxes for bounties, or to statutes authorizing special local assessments. * * *" Cooley Taxation, Vol. 2. fourth edition, section 500, page 1106.

The same opinion has been expressed by the Attorney General of Oregon:

"It has been suggested that to require funds to be diverted from the purpose or purposes for which the statute providing for same directed that they be applied, is in violation of section 3 of article IX of the Constitution of Oregon, which provides

that no tax shall be levied except in pursuance of law, and every law imposing a tax shall state distinctly the object of same, to which only it shall be applied.

"The constituitons of several states provide that every law imposing a tax shall state distinctly the object of the same, to which only it shall be applied. It is held, however, that this applies only to the ordinary and general taxes for state purposes and such as are imposed generally on all the taxable property in the state." Opinions of the Attorney General 1934-1936, page 751.

Supporting plaintiff's position that such provisions apply to all taxes are the following authorities: *Craig County Excise Board v. Texas-Empire Pipe Line Co.*, 195 Okla. 627, 159 P. (2d) 1003; *State v. Oklahoma Tax Commission*, 191 Okla. 155, 127 P. (2d) 1052; *Collins v. Humphrey*, 181 Ark. 609, 27 S. W. (2d) 102; *White Eagle Oil Refining Co. v. Gunderson*, 48 S. D. 608, 205 N. W. 614; In re Opinion of the Judges, 59 S. D. 469, 240 N. W. 600; *School Dist. No. 2 v. Jackson-Wilson High School Dist.*, 49 Wyo. 115, 52 P. (2d) 673; *Unemployment Compensation v. Savage*, 283 Ky. 301, 140 S. W. (2d) 1073; *State v. Osborne*, 193 S. C. 158, 7 S. E. (2d) 526; *City of Sheridan v. Litman*, 32 Wyo. 14, 228 P. 628; *State ex rel. Edwards v. Osborne*, 195 S. C. 295, 11 S. E. (2d) 260; *State v. Crawford Tp.*, 139 Kan. 553, 32 P. (2d) 809; *Board of Education v. Board of Com'rs.*, 137 N. C. 310, 49 S. E. 353; *Rogers v. State*, 129 Ohio St. 108, 193 N. E. 754.

The situation in this jurisdiction is not entirely clear. In *Miller v. Henry*, 62 Or. 4, 124 P. 197 an act was passed directing the county to cancel any claim against the county treasurer on account of money of

the county which was lost by reason of failure of the bank. The court said:

"The last contention is that the act is in violation of that section of our fundamental law which requires that 'every law imposing a tax shall state distinctly the object to which it shall be applied.' It is conceived that this clearly applies to taxes levied by law for general State purposes, as for instance, the legislature could not pass a law providing that a general tax of five mills on the dollar should be levied, collected, and paid into the State treasury without specifying the purpose for which the levy was to be made, and this is the holding of the courts. 'The constitutions of several states provide that every law imposing a tax shall state distinctly the object of the same, to which only it shall be applied. It is held, however, that this applies only to the ordinary and general taxes for state purposes, and such as are imposed generally on all the taxable property in the state, and not to local taxes for local purposes.' 37 Cyc. 728; In re Ford, 6 Lans. (N. Y.) 92; Guthrie County v. Conrad, 133 Iowa, 171, (110 N. W. 454); Guest v. Brooklyn, 8 Hun (N. Y.) 97; Southern R. Co. v. Kay, 62 S. C. 28 (39 S. E. 785.)''.

*Miller v. Henry* is cited by Cooley in support of the quoted text, supra. On the other hand, in *Astoria v. Kozer,* 124, Or. 261, 264 P. 445, a statute provided in substance that all state taxes collected within the city of Astoria should be refunded. The question was whether "all state taxes" included only property taxes or gasoline taxes, inheritance taxes and the like. It was held that the phrase should be construed to mean only property taxes. The court cited constitution Article IX, section 3 and said:

" * * * Motor vehicle and gasoline taxes, being levied to raise money for public roads, cannot be diverted from that purpose. Said Chapter 280

would be unconstitutional under said Article IX, Section 3, if we should construe it to include the taxes raised for highway purposes. * * *''

The reference to Article IX, section 3 was unnecessary to the decision. Its effect was not discussed in the brief nor does the opinion mention *Miller v. Henry,* supra.

We find it unnecessary to decide whether or not Article IX, section 3 applies to income taxes and the like, or only to property taxes. The question presently before us is not whether the legislature can pass an act diverting funds raised by income taxes from a purpose to which only they are devoted by previous legislation. If that question were here, it would be necessary to determine whether the constitutional provision applies to income taxes. The question here is whether certain income tax surplus funds have been, by statute, devoted to a special purpose only, and if so, whether there is an attempted diversion therefrom. In this case therefore, constitution Article IX, section 3 would apply only if its application should be unnecessary, because, if those funds are applied by law to some special purpose, the statute alone would prohibit diversion therefrom.

Reversing the procedure followed in plaintiff's brief, we will consider first the single question of statutory construction.

The plaintiff asserts that ''Any amendment of Property Tax Relief Act diverting the revenues would be void under Or. Const., Art. IV, sec. 20, as outside the title of the act''. Article IV, section 20 of the Constitution is as follows:

"Every act shall embrace but one subject, and matters properly connected therewith, which subject shall be expressed in the title. But if any subject

shall be embraced in an act which shall not be expressed in the title, such act shall be void only as to so much thereof as shall not be expressed in the title.''

The effect of the constitutional provision is to require that the general subject of an act shall be expressed in the title but to permit provisions ''properly connected'' with the subject to be included in the act though not mentioned in the title. In *Eastman v. Jennings-McRae Logging Co.*, 69 Or. 1, 138 P. 216, this court said: '' * * * It is the *subject* of the act, and not 'the matters properly connected therewith,' that shall be expressed in the title.'' See also *Pacific Elevator Co. v. Portland,* (1913) 65 Or. 349, 133 P. 72, 46 L. R. A. (N. S.) 363; *In re Willow Creek,* (1915) 74 Or. 592, 144 P. 505, 146 P. 475; *Clayton v. Enterprise Electric Co.,* (1916) 82 Or. 149, 161 P. 411; *State v. Eaton,* (1926) 119 Or. 613, 250 P. 233; *Nickerson v. Mecklem,* 169 Or. 270, 126 P. (2d) 1095.

The title of the 1929 personal income tax law is as follows:

''AN ACT providing for property tax relief by the levying, collecting and paying of taxes on incomes; providing for rules and regulations and prescribing penalties, and making an appropriation for carrying out this act.''

Any provision of the act which was germane to the general purpose would not under our decisions, be violative of the constitutional provision. If the 1929 act in the disposition section had expressly provided for the application of proceeds from the income tax to the elimination of specified taxes on property, and had then provided that the excess funds, if any, over and above the specified allocations should be covered into the

general fund, we think the provision for the disposition of such surplus, if any, would have been germane to the general purposes of the act. Plaintiff contends that since the purpose of the tax was stated in the title to be property tax relief, "that purpose could not be changed by subsequent amendment of the act". This would seem to imply that the plaintiff considers some of the subsequent amendments which have been made to the 1929 act to be unconstitutional, but such is not the substance of the argument. Plaintiff recognizes the validity of the 1947 amendment and would enforce it according to his construction of its provisions. The question before us is not whether the purpose could be changed by the subsequent legislative amendments of the 1929 act or by future amendments. The question is whether the original act and the amendments properly construed are germane to the general purpose of the act stated in the title. In our opinion the title should not be construed as if it provided that all proceeds from the income tax should be used exclusively for property tax relief. There is nothing in the title which suggests the creation of anything akin to a trust fund applicable to surplus collections from the income tax law. The title indicates a purpose to afford relief from property taxes by imposing an income tax. It refers to property tax relief, not to property tax reduction. It does not indicate how that relief shall be given. So far as the title is concerned, property tax relief could be afforded by rendering it unnecessary to levy a property tax, or it could be afforded by the levying of a property tax and then reducing that tax by the application of income tax revenues. So far as the title is concerned, property tax relief could be accomplished by treating income tax surplus as a part of miscellaneous receipts, thus rendering it unnecessary to levy a property tax, just as

well as it could be accomplished by levying the property tax and then offsetting it by income tax proceeds. At the time when the 1929 act was passed there was apparently no expectation that the proceeds from income tax would do any more than reduce the amount of the direct tax levy which the Tax Commission would otherwise apportion to the several counties of the state, and that is all that was in fact accomplished.

Attention has been directed to the fact that the income tax law was referred to the voters and to the understanding which the voters had concerning the purposes of the law. The twenty-five word ballot title of the proposed measure as it appears in the Voters' Pamphlet for the referendum election of November 4, 1930, was as follows:

"INCOME TAX BILL—Purpose: Levying a progressive income tax upon net incomes of natural persons and deducting amount received from such tax from the amount necessary for state purposes."

The general title appearing in the Voters' Pamphlet and on the ballot was as follows:

"INCOME TAX BILL—Purpose: To levy and collect annually a progressive state tax upon net incomes of resident and non-resident natural persons and fiduciaries, from every source within the state and from property taxable therein; making exemptions to single person of $1,500; married person, head of family, or husband and wife together, $2,500; and for each child or dependent under certain conditions, $400; and providing that the estimated amount of income taxes for each year be deducted from the total amount of revenue required for state purposes, and only the balance of such required amount be levied as direct taxes on property."

There is nothing in either statement of the purpose of the act which is suggestive of the creation of any trust fund. The short title clearly expresses the idea that the proceeds of income taxes will be less than the amount necessary for state purposes and that such proceeds shall be deducted therefrom.

The long ballot title indicates the following purpose; that from the amount of revenue required for state purposes, there shall be deducted the estimated amount of income taxes and only the balance of such required amount shall be levied as direct taxes on property. Pursuant to the purpose indicated in the long ballot title, it would appear to have been the legislative intent in 1929 that all revenues from income taxation, together with other miscellaneous receipts, should be deducted "above the line" so that if, in 1929, the revenue from income taxation, together with other miscellaneous receipts had been equal to the amount of revenue required for state purposes, there would have been no balance to be levied as direct taxes on property. If, in 1929, all revenues from income taxation were to be deducted from state expenses, as the long ballot title indicates, it could scarcely be argued that in 1948 it would not be germane to the purpose of the act to provide that surplus income tax revenue may be deducted in like manner from state expense.

Continuing with the matter of the title of the act; if the legislative title expresses a purpose more narrowly than is expressed in the ballot titles which were submitted at the referendum election, then it would appear that the rule announced by this court in *State v. Hawks,* 110 Or. 497, 222 P. 1071, would apply. In that case the legislative title was held to be defective because it contained no reference to the levy of taxes by counties

for market road purposes, but it was further held that the ballot title furnished by the Attorney General, "and which was a part of the measure as the same was submitted to the people remedied that defect."

The funds which we have described as income tax surplus are derived from the personal income tax law of 1929 and from the excise tax of 1929 which is also a tax on or measured by income as both acts have been amended. We are not advised as to what portion of the surplus is derived from the one law or from the other. The surplus presents a single question. Any argument which could be made from the title of the personal income tax law is greatly weakened when we examine the title to the companion acts which were passed in 1929 as a part of a single comprehensive plan of taxation. The title of the excise tax of 1929, the proceeds from which are involved in this controversy, reads in part as follows: "AN ACT to provide for an excise tax (upon corporations, etc.) * * *; to provide for the disposition of proceeds of tax; * * *". No part of the title refers to any purpose of property tax relief. The intangibles law, since declared unconstitutional which was the third of the 1929 acts, is preceded by a title similar to that of the excise tax law. It would certainly be improper to construe the title of the personal income tax law as affecting the excise tax law which has a different title of its own, and which gives no indication as to any limitation in the disposition of funds.

As we have stated, in addition to other relief sought, the prayer of the complaint is for a mandatory injunction requiring defendants to make the finding required by Oregon Laws 1947, chapter 77, section 2, and to certify to the Secretary of State that a necessity exists for levying a tax in excess of the 6 per cent constitutional

limitation. Constitution Article XI, section 11, provides that the state shall not in any year so exercise the power of taxation as to raise a greater amount of revenue for purposes other than the payment of bonded indebtedness or interest thereon than the amount of the base plus 6 per cent unless authorized by the voters. As stated, it is the theory of the complaint that it is necessary to hold a popular election to authorize a levy outside of the 6 per cent limitation in order to permit the use of income tax funds to eliminate the deficit of $5,862,328.49, but the levy, if authorized by the people would not raise any revenue. The revenue has already been raised. A valid levy raises no revenue unless certified to the counties, extended on the rolls and collected from property owners. If then, the levy proposed will raise no revenue, it cannot be said that the 6 per cent limitation applies or that a popular election is required. The first preliminary research report prepared by the Director of Research in March, 1946, which was submitted to the Oregon Tax Study Commission, persuasively states that the 6 per cent limitation has no reference to appropriations or expenditures of funds. The issue in the case at bar is solely one concerning the use of revenue already raised and not one involving the raising of revenue. The prayer of the complaint for a mandatory injunction, as set forth, should therefore be denied. It remains to be determined whether the administrative officials may lawfully apply in the state tax levy for the fiscal year 1948-1949 income tax surplus to any purpose other than ''to reduce or to offset'' taxes which would otherwise be levied on property. In other words, it remains to be determined whether such income tax surplus or estimated surplus is, or is not ''applied by law to some special purpose''.

The disposition section of the personal income tax law of 1929 reads in part as follows: "The net revenue arising under the operation of this act in excess of $10,000 * * * shall be assigned to the state of Oregon and shall become a part of the general fund in the hands of the state treasurer." The portion which provides that such net revenue become a part of the general fund is repeated in all subsequent amendments. The same provision is to be found also in the disposition sections of the excise tax law as originally adopted and as amended.

It is significant that the first provision in the disposition section is one which places all income tax collections in the general fund as contrasted, for example, with O. C. L. A., § 100-108 which creates a state highway fund and provides that revenues received are allocated or dedicated for highway purposes and may be used only for purposes of the act. Nor did the legislature follow the method employed when it was desired to earmark revenues derived from the taxing of liquor. We quote:

"* * * there hereby is appropriated the sum of twenty-two million dollars ($22,000,000) from all the net proceeds of revenues * * * from the * * * taxing * * * of liquor, which otherwise would be appropriated to the state government * * *, notwithstanding the general provisions of any other act providing for the distribution * * * to the state government * * * Said funds shall be paid to the state treasurer and credited * * * to a fund separate and distinct from the general fund, to be * * * available for public assistance purposes." Oregon Laws 1947, chapter 444.

The procedure is also in sharp contrast to many statutory provisions which place moneys in the general

fund but which provide that when paid into the general fund they shall constitute a special fund. See for illustration, O. C. L. A., § 45-105, which provides that the moneys received by the State Board of Aeronautics shall go into the general fund, but "shall constitute and be considered as, and hereby are made, an appropriation, known as the 'state aeronautics fund' ".

It would be natural to assume that moneys placed in a general fund would remain available for general state purposes, except to the extent that the statute may expressly earmark, appropriate or allocate portions of them to special purposes. If we were to assume that Article IX, section 3 of the Constitution applies to income taxes, that provision would be satisfied by words allocating the proceeds to the general fund. The *People v. The Supervisors of Orange County*, 17 N. Y. 235; *The People v. The Home Insurance Company*, 92 N. Y. 328; *City of Sheridan v. Litman,* supra; *State v. Sheppard,* supra; *State v. Thompson,* 25 S. D. 148, 125 N. W. 567.

We understand that it is conceded, and properly so, by both parties, that money which has been placed in the general fund may be allocated to a special purpose, and if that has been done, the administrative officials would be bound thereby, but, as we have pointed out, the legislative methods for accomplishing such allocations are well known, if not standardized.

The next portion of the personal income tax of 1929 is as follows:

" * * * The proceeds of this tax, like that from other miscellaneous sources, shall be taken account of by the tax commission in making the annual levy for state purposes." Laws, 1929, section 37.

In the summary reproduced, supra, from the plaintiff's complaint, we find "miscellaneous receipts" listed at $6,000,000, which sum is deducted from state expense of $19,000,000. The same phrase appears in chapter 477 of the Laws of 1947. The provision of the 1929 act that the proceeds from the income taxes shall be taken account of "like that from other miscellaneous sources" would seem to imply that income tax collections shall be treated like miscellaneous receipts. This phraseology remained unchanged until the 1943 amendment. The disposition sections of the 1943, 1945 and 1947 acts merely eliminate the word "miscellaneous" and provide that "Such revenue, like that from other sources, shall be taken into account by the tax commission * * * ". It would be in harmony with the procedure provided in 1929 if, under the 1947 act, surplus from income tax collections were included as a part of miscellaneous receipts along with the $6,000,000 item in plaintiff's summary, supra. The disposition section of the income tax law next contains the provision on which plaintiff strongly relies: " * * * It is the expressed intention of this act that the revenue derived from the tax shall reduce by corresponding amount the direct tax levy which the tax commission would otherwise apportion to the several counties of the state.* * * " Laws of 1929, chapter 448. This language clearly implies that the revenue derived from the income taxes would be less than the amount of the direct tax levy which the Tax Commission would otherwise apportion to the several counties of the state, because such levy was to be reduced by the corresponding amount of the proceeds from the income taxes. It is important to note that as the proceeds from income taxes greatly increased in amount, the provision that the revenue derived from income taxes should reduce

"by corresponding amount" was eliminated, and in place of the language deleted, the 1943, 1945 and 1947 acts employed the following language:

"* * * It is the expressed intention of this act that the net revenue derived from this tax shall be applied first to reduce the state tax levy on property inside the 6 per cent constitutional limitation and then to reduce the state levy on property outside said constitutional limitation. * * * "

From 1943 on, therefore, there was no requirement that property tax levies should be reduced by an amount *corresponding* to the amount of the proceeds from income taxes.

To summarize: When the estimated income tax revenues were comparatively small, it was stated to be the expressed intention that such revenue should reduce by corresponding amount the direct tax levy which the Commission would otherwise apportion to the several counties of the state. Since 1947 it has been the expressed intention to apply income tax revenue, first, to the costs incurred in administration of the act, and then to apply them to various specified purposes, which purposes, however, do not exhaust the income tax proceeds which went into the general fund.

It is not clear that the legislature in fact ever intended, even in 1929, to provide that income tax proceeds should be allocated exclusively to reducing a direct state tax levy. It would have been a simple and common procedure to have provided that the proceeds from income taxes shall be put in a trust fund for property tax reduction only, or that all such funds be "transferred" from the general to a special fund. Instead, conscious of an impending referendum, the legislature stated in good faith an expressed intention,

not, however, for the purpose of tying up the fund as tightly as would have been done if the usual legislative language had been used. Although it was stated as the expressed intention that revenue derived from income taxation shall reduce by corresponding amount the direct tax levy which the Tax Commission would otherwise apportion to the several counties of the state, nevertheless the formula contained in the same section of the 1929 act states exactly how the state income tax proceeds were to be accounted for and applied. The law provided that:

" * * * the commission shall estimate the total amount of revenue to be raised under the several millage taxes in force and the amount necessary for miscellaneous state purposes as enumerated under section 4215, Oregon Laws [now sec. 110-534, O. C. L. A.]; and shall deduct therefrom any surplus or estimated surplus remaining in the state treasury from all funds, however derived, and also the estimated net proceeds of this tax for the next ensuing calendar year. Only the remainder left after subtracting said surplus and the estimated receipts of this tax shall be apportioned among the several counties as provided for by law. * * * " Laws, 1929, chapter 448, sec. 37.

Thus the act employes the language which appears in O. C. L. A., § 110-534, and provides that, from the amount required to be raised, there shall be deducted "any surplus or estimated surplus remaining in the state treasury from all funds, however derived," and also the estimated net proceeds from the income taxes for the next ensuing calendar year. This mandate seems to us to be in harmony with the idea that, in 1929, the income tax proceeds should be added to miscellaneous receipts and be deducted "above the line" before determining what the deficit to be raised by

property tax levy should be. The act provides that: "Only the remainder left after subtracting said surplus and the estimated receipts of this tax shall be apportioned among the several counties as provided for by law." If there was no remainder there could be no property tax.

Of course, there is a different situation under the 1947 act, for it contemplates a substantial increase in income tax revenue and specifically allocates many millions thereof to particular tax reduction purposes. But there seems no reason expressed in the statute why the untransferred surplus in 1947 should not be deducted along with other miscellaneous receipts (the $6,-000,000 item) above the line, so that no deficit of $5,800,000 would appear and no tax levy be required.

We next consider the history of the provision in the 1929 act, which is as follows: "The proceeds of this tax, like that from other miscellaneous sources, shall be taken account of by the tax commission in making the annual levy for state purposes." In these words, we find no hint of any intention to treat any of the proceeds of the income tax as a special fund or to do anything more than to take account of the amount of the proceeds in making the state property tax levy. The formula for taking "account" follows in the same section and has already received our attention. Unlike the 1947 statute, the 1929 act mentions no specific property tax which is to be reduced by application of income tax revenues, except by the general provision that the income tax revenues shall reduce the direct tax levy which the Tax Commission would otherwise apportion to the several counties of the state. The act does not say that income tax revenues shall reduce property taxes which the Commission shall have levied, but

rather that those revenues shall reduce the direct tax levy which the Commission would otherwise apportion, in other words, the levy which would be apportioned but for the application of income tax revenues.

Assuming the facts to be as they in fact were, that the income tax revenues would be less than the amount of the direct tax levy which would otherwise be apportioned to the several counties, the intent of the 1929 act is clear. They were not dealing with any possible surplus over and above intended property tax reduction, and the property tax relief was accomplished by deducting surplus and estimated receipts produced by the income taxes from the total expenses. (O. C. L. A., § 110-534, as amended by laws 1941, chapter 440.)

The factor which has resulted in confusion and ambiguity in the tax system for many years has been the anxiety of the legislature to avoid losing the tax base and the uncertainty as to what circumstances might result in its loss. Consequently, since the time when the income tax revenues have been sufficient to eliminate state property taxes, it has been thought necessary to continue to levy such taxes in order to avoid losing the tax base, notwithstanding the fact to which we have referred, that the six per cent limitation applies only to the raising of revenue and not to the use of revenue already raised. The March, 1946, report to the Orgeon Tax Study Commission states as one of the accepted interpretations, "in spite of conflicts in official interpretations", the following:

"A taxing district does not lose a 'tax base'. When no levy has been made for a period of three years, the limitation does not apply and, for purposes of levying a tax, the taxing district assumes the status of a new district."

The Attorney General has rendered an opinion to substantially the same effect. Opinions of the Attorney General, 1936-1938, page 660. We think this interpretation is sound. The Constitution prohibits the levy without vote of the people in any year so as to raise a greater amount than the total amount levied in any one of the three preceding years. Clearly, the provision applies to property taxes and contemplates that there should have been a levy which raised an amount of revenue in some one of the previous three years. Any other construction would be the equivalent of a rule that, if no tax has been levied and no amount raised for three years, then no taxing body can levy a tax or raise any revenue thereafter. The tax levying body would thereby be penalized for its self-restraint in refraining from levying any property tax for three years. Such was not the intent of the people in adopting the six per cent amendment.

The foregoing considerations lead to a conclusion that, although the state has not levied a property tax for three years, it was not necessary under the 1947 Laws, chapter 477, to take steps leading to a popular election to raise money in excess of the six per cent limitation, merely to maintain the tax base, nor is such an election necessary to raise funds, since no funds would be raised thereby.

The 1929 act would impose an income tax and would give property tax relief, but it would not deal with any problem of disposition of surplus, because no surplus was contemplated. The 1947 law rests in a different context of fact.

As the revenues and estimated revenues from income taxation increased, the legislature was confronted with the problem which had not arisen in the early

years of income taxation, namely, the disposition of surplus after specific transfers to property tax reduction accounts had been made. By Oregon Laws, 1943, chapter 441, it was provided that:

"* * * In the event that the revenue from this tax and the revenue from any other tax on or measured by net income for any fiscal year shall exceed the amount necessary to eliminate the state levy on property otherwise required to be paid into the state treasury by the several counties for such year, the remainder of such revenues shall be accounted in the state levy of taxes and applied as follows: * * *".

It was then provided that such excess should be applied to reduce the property tax otherwise to be apportioned to the several counties for the state elementary school fund, and after that the remainder should be transferred in an amount not exceeding $5,000,000 to the state school support fund. Next, the remainder was to be transferred to an account to be known as the property tax reduction account, to be applied in the state levy of taxes for the next ensuing fiscal year for the purposes above stated. It was then provided that:

"In the event that the amount in said property tax reduction account at the close of any fiscal year plus the estimated receipts from this tax and from any other tax on or measured by net income, as accounted in the state levy of taxes for the next ensuing fiscal year, shall exceed by not less than five million dollars ($5,000,000) the total amount required to offset all the aforesaid state taxes otherwise to be levied on property, * * * " a discount would

be allowed the income taxpayer of five per cent for each $1,000,000, or major part thereof, in excess of $5,-000,000. Thus in fact, the legislature provided for the

elimination of any substantial surplus over the amount specifically allocated to property tax reduction. The amendment of 1945 followed a similar policy. It defined the specific purposes to which, in order of priority, income tax revenues were to be applied and again provided for a discount to income taxpayers from any surplus. The 1947 act (Laws, 1947, chapter 466) again set forth the specific property tax reduction purposes to which income tax revenues should be applied and provided for income tax discount, as follows:

"* * * In the event that at the end of any fiscal year, the estimated receipts from this tax and any other tax on or measured by net income, required to be accounted for in the state levy of taxes for the ensuing fiscal year, shall exceed the aggregate of the amounts hereinbefore required to be transferred or accounted for, there shall be allowed upon tax returns for tax years beginning in the calendar year during which such excess is determined a discount of 5 per cent for each one million dollars excess or major part thereof; * * * ".

But, as a final proviso, the act then specified that "no discount shall be determined for the calendar year 1947 or the calendar year 1948 or for fiscal years beginning within either of said calendar years."

From the plaintiff's brief we read:

"By the so-called 'Walker plan', the 1943 legislature provided for a discount in individual income taxes to take care of any balance on hand (in excess of a certain 'cushion') after applications to specific property tax relief items had been made."

Thus it appears to be conceded that, under the 1943 law and until the elimination of the discount by the 1947 law, the legislature arranged to take care of the balance by seeing to it that there should be none, or at

least, substantially none. The 1943 and 1945 acts recognized that the estimated income tax revenues may exceed the aggregate of the amount "required to be transferred or accounted for" and disposed of that excess by the income tax discount. When the discount was eliminated for 1947 and 1948, that excess remained. It was still an excess not "required to be transferred or accounted for". If not required to be transferred or accounted for, it remained where it had been put, to wit, in the general fund. If the 1947 law remains unchanged, the income tax discount will again apply in the fiscal year 1949-1950 and the surplus will again be substantially eliminated. The question before us relates only to the surplus temporarily accumulated by reason of the suspension of the discount.

Another circumstance leads to the conclusion that the 1947 act does not allocate the income tax surplus to property tax reduction. The 1947 act demonstrates how revenues in the general fund may be allocated to specific purposes, i.e., how moneys in the general fund may be "applied by law to some special purpose". That act provides that after certain applications of income tax revenues have been made, the portion for the state elementary school fund shall be *transferred* from the general fund, where it was originally placed, to "an account in the general fund to be known as the state elementary school fund account". Similar language provides for money to be *transferred* to a fund in the state treasury to be known as the state school support fund. Again, the $5,000,000 cushion is to be *transferred* "to an account in the general fund to be known as the property tax reduction account". In this very act, the legislature knew, and practiced, the legislative art of allocating moneys in the general fund to a special fund

therein by means of a "transfer", but the legislature provided for no transfer of the income tax surplus to any special fund. It, therefore, remained in the general fund.

The next provision of importance in the 1947 act relates to the so-called $5,000,000 cushion, the property tax reduction account. The act refers to (1) "the total amount required to offset all the aforesaid state taxes otherwise to be levied on property", together with (2) "the additional sums herein required to be transferred in each of the fiscal years 1945-1946 and 1946-1947 to the property tax reduction account", and provides that, if the property tax reduction account at the close of any fiscal year, plus the estimated receipts from income taxes, shall exceed by not less than $5,000,000 the total of items (1) and (2), then a sum which the complaint states to be about $3,200,000 shall be *transferred* "to a fund in the state treasury to be known as the state and county school fund".

We think that the legislature clearly expressed the idea that the $5,000,000 cushion in the property tax reduction account constituted a sufficient reserve, or cushion, to be applied in the state levy of taxes for the next ensuing fiscal year, and we think further that the transfer of that specific amount over and above the amounts allocated to the reduction of named property taxes negatives the idea that the income tax surplus should also constitute a part of the cushion. If it was the intent of the legislature that the cushion should not be limited to $5,000,000, but should include the entire surplus from income taxation, it would have provided that there shall be transferred to the property tax reduction account the $5,000,000 mentioned in paragraph 3, section 1, chapter 466, Laws 1947, and the surplus, if

any, after the required transfer to the state and county school fund, as provided in the succeeding paragraph.

We will next comment on certain matters presented in plaintiff's brief on appeal. Attention is there called to the fact that the people repealed the income tax of 1923 and rejected the proposed income tax of 1927, and that, though both measures provided for property tax relief, no reference thereto was made in the respective titles, "which is about all the average voter reads". The brief continues, "The conclusion is inescapable that the voters have not been willing to add 'just another tax' for general governmental purposes". Throughout the argument, counsel puts emphasis on the proposition that the title is the thing which limits the application of income tax revenue to the reduction of property taxes. Comparatively little space is given to the construction, sentence by sentence, of the body of the various acts. Even assuming that we are wrong in our conclusion as to the effect of the title to the 1929 personal income tax law, there is reason to believe that the surplus from the excise tax of 1929 would take care of the so-called deficit, even if the surplus from the personal income tax were held to be limited by the title to property tax reduction. We have already observed that there is no reference to property tax reduction in the title to the excise tax act of 1929. Throughout this opinion, we have referred to provisions of the disposition sections of the personal income tax act and its amendments, but this has been only for convenience. The same provisions appear in the disposition sections of the excise tax act. But plaintiff could prevail only if it should be made to appear that neither the surplus from the personal income tax nor from the excise tax can be treated as remaining in the general fund and

available for general purposes. The adopted construction and scope of the disposition sections of the excise tax law are not controlled by anything in the title.

The general theme of plaintiff's brief is that special purpose funds cannot be diverted by administrative officials, and large portions of the argument are based on the assumption that the income tax surplus is a special purpose fund. This contention we reject. The surplus is the only part of "the remainder of such revenues", referred to in the first paragraph of the disposition section of the 1947 income tax law, which the treasurer is not directed to "transfer" to a special account or fund. It, therefore, remains where it was placed in the general fund.

We are aware of the ambiguities in the act and its amendments and the conflicting interpretations between attorneys general of the state, the legislature and the Tax Commission. Both sides recognize that it is impossible to harmonize all of the facts and so-called practical constructions. The financial statement published in Oregon Laws, 1947, includes an item entitled, "Property tax reduction account, state income taxes . . . $38,800,000.00", which appears under the heading, "Receipts from following sources credited to General Fund and appropriated for specific purposes." An inference might be drawn from this that the official who prepared the statement believed that all revenues from income taxes were so appropriated, but this statement is not such a practical construction as is entitled to much weight.

Plaintiff frankly states: "We do not contend that the character of property tax relief funds is to be determined by the way they are listed in the Financial Statement." Plaintiff's brief emphasizes the fact that

the volume of income tax funds has varied and may greatly vary in the future, and that no one can justifiably assume that the income tax collections will be sufficient in the future to meet the specific applications now required. We agree. If income tax revenues in the future are insufficient to meet the required specific applications, there will be no surplus and no question for decision.

Counsel eloquently pleads the cause of the overburdened taxpayer, but we think that the plea should be directed to the legislature or to the people and not to the court. So long as the legislature has power to control the rates under income and excise tax laws, the fate of the taxpayer is in the hands of the legislature, whatever the opinions of this court may be on the subject.

Counsel asserts that defendants claim to have found a "loophole" which "permits the threatened diversion", (again assuming that defendants are attempting a diversion). They refer to a contention of defendants that a surplus is "left dangling in the air" and they add, "This contention, whether well or ill founded, reflects a disposition to take advantage of any mistake in legislative draftsmanship * * *". We have been shown no evidence that the creation of surplus by suspending the discount under the Walker Plan was the result of any mistake in legislative draftsmanship and we are still required to seek the legislative intent in the words of the statute. Counsel for the plaintiff significantly point out that the 1939 act, in effect until the 1943 amendment, left a "dangling surplus", but that the Commission made no attempt to divert it to general purposes. The counsel also point out that the 1943 and 1945 acts did not leave the surplus dangling; "income taxes were reduced to use up the surplus."

Counsel then makes this notable concession: ''By temporarily suspending the discount under the 1947 act, the surplus was again left without specified application.''

What we have already said demonstrates that at the times when the Tax Commission was expressing the view that income tax revenues were limited exclusively to property tax reduction, there was as yet no serious problem concerning income tax surplus. When a substantial surplus did become imminent it was ''taken care of'' by the Walker Plan. Only upon suspension of the Walker Plan has an issue of major importance involving large sums of money been directly presented. It is for this reason that we are of the opinion that the decision in this case should not be conrtolled by the so-called practical construction which was announced under circumstances materially differing from those which have arisen since the suspension of the income tax discount.

Perhaps the most serious argument presented by plaintiff is based on Laws 1947, chapter 477, supra. When that act was passed there was reason for legislative uncertainty as to the legal status of the income tax surplus. If that surplus was a special purpose fund devoted only to the reduction of property taxes first levied, and if it was necessary to levy a property tax in order to maintain the tax base for future years, or if, as some appear to have assumed, the six per cent amendment applies to the levy of a tax which is never to be certified to the counties and from which no revenue is to be raised, then it is not difficult to understand why the legislature passed chapter 477. Under that act the Tax Commission is directed to make a finding as to whether or not revenues available within the six per cent limitation, plus estimated miscellaneous re-

ceipts, are sufficient to meet necessary expenses. If found insufficient, the Commission is to certify to the necessity of a tax levy in excess of the six per cent constitutional limitation. While the legislative opinion, as to the effect of constitutional limitation, is entitled to consideration, the legislature is not authorized to determine the effect of a constitutional provision since that duty rests upon the judicial department of the state. In view of the considerations above presented, we conclude that chapter 477 does not require the Tax Commission to certify to the necessity of a popular election because the income tax surplus has not been applied by law to some special purpose and is therefore properly included in estimated miscellaneous receipts in harmony with the formula presented in the original act of 1929. In declining to make such certification, the Tax Commission does not violate chapter 477, assuming that act to be constitutional.

Upon consideration of the practical realities of the matter it becomes clear that if an election were held under the provisions of chapter 477, and if the people voted in the affirmative, not one dollar of income tax revenue would actually be applied for property tax reduction or property tax relief. No property taxpayer would pay one cent less on property taxes than he would have paid if the election had not been held. A taxpayer would get little "relief" from a procedure which imposed a new burden on property merely for the purpose of removing it. The submission of the issue to popular vote would amount to nothing more than an order by the Secretary of State, based on a certificate of the Tax Commission, calling an election to authorize the use of income tax proceeds for the general purposes of the government. Such is the issue which would in

fact be submitted to the people, who would be told that the property tax, if authorized, would never be collected. Chapter 477 provides that under the conditions specified, the Commission "shall certify to the secretary of state that, to meet said requirements as determined and certified by the board of control, a necessity exists for levying a tax in excess of the said constitutional limitation." Only upon receipt of such a certificate is the Secretary of State authorized to call an election. This court cannot, by mandamus, direct the Commission to make a certificate that certain action is necessary under a constitutional provision unless the Constitution is applicable to the issue, and this, as we have said, is a judicial question. We therefore cannot require, nor can we authorize the Tax Commission to certify that a necessity exists for levying a tax in excess of the six per cent constitutional limitation when, as we have said, the question relates to the disposition of funds already raised, and when, as we have also held, the six per cent provision is a limitation upon the power to raise a greater amount of revenue than the amount of the base plus six per cent, and does not purport to control the expenditure of revenues already raised.

Section 4 of chapter 477 relates to the situation which arises if and when an election has been called and held to authorize a property tax levy in excess of the limitation imposed by Article XI, section 11 of the Constitution, and provides that in such case the levy so made shall be offset by income tax revenues. Since no election is required, the provision for offsetting the levy becomes inapplicable. Chapter 477 of the Laws of 1947 does add confusion worse confounded to the whole situation, but in view of the circumstances surrounding its enactment, we think the construction of

the disposition sections of the income and excise tax laws which we have adopted should not be changed by reference to another act, chapter 477, which would have been necessary and proper if the legal assumptions underlying it had been correct. The decree of the Circuit Court is affirmed.

It was essential to the orderly functioning of the fiscal system of the state that the ambiguities in statutes and practice should be clarified. This was a friendly suit, brought in the public interest by the former governor of Oregon. Neither party will recover costs or disbursements.

KELLY, J., dissents.

———

Lusk, J.  (Concurring).

I concur in the opinion written by Mr. Justice Brand, and would not attempt to add anything to it were it not for the fact that in one of the dissenting opinions the impression is created that the surplus tax moneys in question would not be used for general governmental purposes if the position of the plaintiff in this suit should be sustained. I think that this is an erroneous view of the matter.  The plaintiff seeks a mandatory injunction to compel the Tax Commission to proceed under the provisions of Ch. 477, Oregon Laws, 1947. If that were to be done and the commission should make the finding contemplated by that chapter, and if the election therein provided for were held and the people voted affirmatively on the so-called tax levy—as the legislature evidently hoped they would—, the result would be precisely the same as it will be under the opinion of the court.  In either instance the surplus

would be used to meet the existing deficit and to pay the expenses of the state government. The only difference is that in the one case the Tax Commission would go through the form of levying a tax which is never intended to be collected, which never would become a burden on real property, which under the express terms of Ch. 477 would be offset by the income tax surplus; and in the other case the same purpose would be accomplished without resorting to what is in fact a fictitious levy and an election. There would be just as much property tax relief in the one case as in the other and no more. To a large extent, therefore, in my opinion, this controversy is much ado about nothing, since one of the main objectives which plaintiff seeks to attain is to bring about the very same use of the income tax surplus which the commission proposes to make of it, but without the cumbersome procedure which has been resorted to in the past and for which, in my judgment, there has never been any necessity legal or otherwise.

ROSSMAN, C. J., dissenting.

I cannot agree with the majority. I believe that the income tax law of 1929 (§§ 110-1601 to 110-1638, O. C. L. A.), which the majority properly term the Property Tax Relief Act, means today the same as it has meant throughout the nineteen years it has been a part of our laws. A reading of the majority opinion cannot fail to impress one with the unvarying consistency with which the legislature, in framing its enactments, has held to the views that income tax money (1) is special purpose money; (2) can be used only for the purpose of offsetting property taxes; and (3) is paid by the taxpayer, not as an additional tax, but in lieu of other taxes.

The majority declare that the Property Tax Relief Act contains ambiguities. Their exact words are: "We are aware of the ambiguities in the act." But it is never right to say, "I see what you mean, but, since you used ambiguities, I will disregard what you mean." Everyone has understood what the act has meant ever since it was adopted by the people in 1929. I shall presently give examples, but I first direct attention to the fact that the State Tax Commission is charged, not only with the administration of this act, but also with its construction.

I now come to instances which show that the Tax Commission has uniformly construed and administered the income tax as a property tax relief measure. In its 1935 report the Commission said (p. 49):

"Each of the three income tax measures definitely provides that all of the net revenue derived therefrom must be used exclusively to reduce the state tax on property."

The 1937 report of the Commission listed receipts from income taxes, intangible taxes and corporate excise taxes for the years 1933 to 1936, and then said (p. 5):

"As distinctly provided by law, these amounts have been applied for the respective years to offset property taxes which otherwise would have been levied, * * *."

The 1939 report (p. 21) says:

"The three laws imposing taxes on incomes produced approximately $25,000,000 in revenue during the years 1929 to 1938, inclusive. Every cent of this sum has been applied, in accordance with the mandatory provisions of the laws, to reduce the tax on property which otherwise would have been levied * * *."

From the 1941 report (p. 12), I quote:

"The revenues produced by the taxes imposed upon or measured by net income are by express provision of law applied in the state tax levies to replace and, if possible, to eliminate the taxes which would otherwise be leviable on property."

The 1943 report (p. 12) said:

"If the distribution from the state income tax account to the school districts are used to reduce property taxes by a corresponding amount, as the title of the bill provides, the diversions would not defeat the original intent of the income tax legislation, namely, that the proceeds shall be wholly used for property tax reduction."

The 1945 report (p. 3) said:

"Income taxes, in keeping with the expressed purpose of their imposition, have been applied to offset and reduce property taxes."

The Attorney General shared the same views. In his Opinions for the period 1944 to 1946 (p. 173), it is said:

"All revenues in the state school support fund are derived from taxes on or measured by net income. The laws imposing the tax from which such revenues are derived distinctly state in each instance that the purpose of the tax is to reduce ad valorem taxes on property. Such revenues can be applied to no other purpose. Section 3, Article IX, Oregon Constitution."

It is easy to show that the legislature entertained the same views as those expressed in the above excerpts taken from the Reports of the Tax Commission and the Opinions of the Attorney General. As I have pointed out, a reading of the majority opinion shows the remarkable fidelity with which the legislature has adhered to the view that income tax money is not avail-

able for general purposes, but I now go on to some occurrences which extended over a period of more than ten weeks and which show clearly the legislature's interpretation of the income tax act. His Excellency, the Governor of this State, on January 13, 1947, as shown at page 273 of Senate and House Journal, in an address to the legislature, mentioned a deficit of $6,000,000 in the general fund, and then said:

> "This budget deficit can be met by an amendment to the corporate excise tax law which would place those moneys in the general fund. There are funds sufficient at the present time to balance the budget as submitted and leave a slight surplus."

Note should be taken of the fact that the Governor referred to the corporate excise tax law and not to the personal income tax act. The two are companion measures, but the phraseology of the former lacks one of the restrictive clauses present in the income tax act. Notwithstanding the Governor's recommendations, the legislature did not take the course which he suggested. Ten weeks later, as shown by Senate and House Journal (p. 409), the Chief Executive addressed the legislature again. The ten weeks had been spent in large part, as is commonly known, in an effort by the legislature to solve the state's financial difficulties. In those ten weeks consideration had been given to the diversion recommended by the Governor and to the enactment of a sales tax. In his address upon this second occasion the Governor declared:

> "It is quite apparent that the members of the legislature do not look with favor upon the suggested transfer of excise tax revenues sufficient to balance the general fund budget. * * * This legislature has studied long and faithfully * * *. Therefore, I feel it my duty to support the legislature in the adoption of a sales tax."

Thus, it is seen that the legislature refused to transfer excise tax money to discharge the general fund deficit. Instead of so doing it adopted the sales tax. It is true that the Chief Executive's recommendation pertained to the excise tax surplus, but since that surplus was hemmed in with fewer restrictions than the income tax surplus, the legislative attitude toward it is significant as to the other surplus also. It is manifest from the events I just mentioned that the 1947 legislative assembly had before it the very issue which is now upon our doorstep, and resolutely adhered to its interpretation of its own legislation; that is, that the surplus produced by tax relief acts is a special fund devoted to a special purpose and not available for transfer into the general fund. It refused to take the course which the majority has embraced. Since the legislature itself wrote this legislation, it certainly knew better than we what its own words meant. The legislative interpretation of the income tax law shown by the occurrences to which I have just adverted, is doubly reinforced by an examination of the acts passed by the 1947 legislative assembly. A reading of them, especially the one mentioned in Mr. Justice BELT's dissenting opinion, will reveal that the legislature throughout its long session uniformly avoided use of the income tax surplus for any purpose except the discharge of indebtedness which would otherwise be taxed against property.

From the foregoing we see that there is before us cogent evidence which shows clearly the legislature's own construction of the terms which compose the income tax act. In an unmistakable manner the legislature construed its own words to mean: (1) The proceeds of the income tax is a special fund; (2) income tax money can be used only to offset property taxes;

(3) the income tax is an in-lieu-of tax; (4) income tax money cannot be diverted to defray general expenses. Clearly, respect for a co-ordinate branch of the government cannot permit us to say that we know better than it does what its words mean.

The majority refuse to give heed to the practical construction which, for nineteen years, has been placed upon the income tax statute. They state as their reason that when the construction was placed "there was as yet no serious problem concerning income tax surplus * * *. It is for this reason that the decision in this case should not be controlled by the so-called practical construction which was announced under circumstances materially differing from those which have arisen since the suspension of the income tax discount." I do not agree with that statement. I very respectfully declare that the circumstances today are not substantially different from those which were present when the long-continued practical construction was manifested and followed. For instance, in 1930, there was a deficiency levy of $2,297,866.87. The next year the deficiency was $3,091,175.10. In 1938 the surplus in the income tax account was $1,175,320.78. In the same year the deficiency was $1,126,571.30. In 1941 the income tax surplus was $2,276,964.04. The deficiency was $851,-026.38. In 1942 the income tax surplus was $6,994,761.81 and the deficiency was $807,868.18. In 1942-1943 the surplus in the income tax fund was $16,109,850.16 and the deficiency was $485,692.06.

It is unnecessary to go further with figures. In 13 years since 1929 there was a deficit; in 14 years a surplus. It is obvious that the majority cannot rid the record of the long-continued practical construction of the act by saying that they were announced "under

circumstances materially differing'' from those of to-day.

According to 42 Am. Jur., Public Administrative Law, p. 392, § 77:

> ''The practical interpretation of an ambiguous or uncertain statute by the executive department charged with its administration or enforcement is entitled to the highest respect from the courts, especially when long continued and uniform, or contemporaneous with the first workings of the statute, or the enactment of the statute was suggested by such agency; and although not controlling the court's decision as to the proper construction of a statute, will not be disturbed except for very cogent and persuasive reasons.''

It is apparent that the long-continued construction of the act before us by those who were charged with its administration should be adopted by us, unless we can assign cogent reasons for disregarding it. I know of no reason for disregarding it, and the majority have mentioned none.

The State Tax Commission is charged with the duty of construing the very act now before us. Section 110-505, O. C. L. A., says:

> ''It shall be the duty of the said state tax commission:
>
> *  *  *
>
> (5) To construe the tax and revenue laws of the state whenever requested by any officer acting under such laws, *  *  *
>
> *  *  *
>
> (11) To recommend to the legislative assembly, at each regular session thereof, such amendments or modifications of the constitution or laws as may seem proper or necessary to remedy injustice or

irregularity in taxation, or to facilitate the assessment and collection of public taxes and revenues.
(12) * * *."

It is not likely that if the tax commission, instead of repeatedly following the practical construction, which it many times reiterated, had held to a different view, the legislature would have removed the so-called ambiguities upon which the majority depend to support their construction. It is no misstatement to say that the administrative interpretations of the act filled out the act itself. Those interpretations must be read concurrently with the act. Everyone knows that important administrative agencies originate legislation and are frequently consulted by the lawmakers. Those are circumstances which lend weight to administrative interpretations. The administrator, having played a part in the framing of the legislation, knows what the legislation means and undertakes to accomplish.

The majority make much of the fact that the income tax collections are deposited in the general fund. They deem that fact "significant." In 1947 Oregon Laws, page 1191, appears a financial statement of all the state's receipts and disbursements. By glancing over it, it will be seen that the state carries many accounts in the general fund; in fact, there are more than ten score of accounts totaling $202,094,941.81, all entered under the heading of General Fund. Each is a separate account, and, hence, the use of the term General Fund is of no consequence.

Article IX, Section 3, Constitution of Oregon, says:

"No tax shall be levied except in pursuance of law, and every law imposing a tax shall state distinctly the object of the same to which only it shall be applied."

The plaintiff depends, in part, upon that constitutional provision to establish the fact that the proceeds of the income tax act are a special fund. The majority say:

> "We find it unnecessary to decide whether or not Article IX, section 3 applies to income taxes and the like, or only to property taxes. The question presently before us is not whether the legislature can pass an act diverting funds raised by income taxes from a purpose to which only they are devoted by previous legislation. If that question were here, it would be necessary to determine whether the constitutional provision applies to income taxes. The question here is whether certain income tax surplus funds have been, by statute, devoted to a special purpose only, * * *."

It seems clear that if "certain income tax surplus funds" are not "by statute, devoted to a special purpose only", the act which raised the funds, being the income tax statute, failed to comply with Article IX, Section 3, which I just quoted. The state is not entitled to take from a taxpayer even a single dollar without complying with Article IX, Section 3, which, it will be remembered, says:

> "Every law imposing a tax shall state directly the object of the same to which only it shall be applied."

In other words, if the money in controversy was obtained by a statute which failed to meet that requirement, it was unlawfully obtained. When effect is given to the constitutional provision, the plaintiff's case is unanswerable, in my belief.

Let us return to the matter of the act's title. I deem the title significant, and am sure that, up to this time at least, virtually all others have so regarded it. The

majority say: "In our opinion, the title should not be construed as if it provided that all proceeds from the income tax should be used exclusively for property tax relief." The title of the act says: "An act providing for property tax relief * * *." It mentions no other purpose. The title governs every dollar raised by the act. It is impossible to find any justification for the majority's assertion; and yet that unsupported assertion is the foot which gets in the door and opens the way for unrestricted spending.

The majority opinion, in brushing aside interpretations suggested by the plaintiff and based upon existing practices, uses phrases such as, "It would have been a simple and common procedure to have provided that", or "If it was the intent of the legislature that * * * it would have provided that." It is safe to say that there is no statute which can withstand such analysis. No statute is so well written but what a court, in the light of the experiences and practices of the ensuing years, cannot phrase it better.

Notwithstanding the majority's use of many book-keeping figures, this case is really a simple one. It involves nothing more than statutory construction. A decision for the plaintiff would do no more than require the Tax Commission to proceed in the future in the same way it has for nineteen years.

These dissenting views will be closed with the observations that, although the income tax act has not been changed since it was enacted in 1929, except by way of strengthening it, the majority opinion now gives the act a meaning substantially different from the one that has been placed upon it from the beginning. For nineteen years all thought that it was not an additional tax, but an in-lieu-of tax. In all of that period

everyone deemed it a tax relief act, but it is easy to see that the majority's opinion will usher in a new era of expenditures. Taxation affects everyone, and it is the uncertainty in the meaning of our tax regulations which plagues businessmen and wage earner alike. Many are driven to the tax expert. The majority opinion sweeps into the wastepaper basket the certainty which was the product of nineteen years' experience.

I dissent.

BELT, J., dissenting.

The decision in this case depends upon the proper construction of the "Property Tax Relief Act of 1929" (Oregon Laws, 1929, chapter 448), as amended, and the "Excise Tax Act of 1929" (Oregon Laws, 1929, chapter 427), as amended. The two acts are identical in their provisions with respect to the application of property tax relief funds.

The precise question is whether the surplus funds derived from these two acts can be used for general governmental purposes. In my opinion, such surplus funds must be applied exclusively to tax relief purposes.

The purpose of the first act is clearly expressed in the title thereof: *"Providing for property tax relief by the levying, collecting and paying of taxes on incomes;  *  *  *."* In what may be called the "disposition section" of the Act (section 37), the intention of the legislature is thus again expressed:  *  *  *  It is the expressed intention of this act that the revenue derived from the tax shall reduce by corresponding amount the direct tax levy which the tax commission

would otherwise apportion to the several counties of the state. * * *'' The same ''disposition'' provision is found in section 23 of the Excise Tax Act. It is significant that, in the various amendments to these acts, the legislature has consistently adhered to the ''expressed intention'' that these funds could be used only for tax relief purposes.

The referendum was invoked on the Property Tax Relief Act of 1929 and was approved by the people in an election held in November, 1930, by a vote of 105,189 to 95,207. It is reasonable to assume that many voters approved the measure because they believed that the funds would be used, as stated in the title of the Act, ''for property tax relief''. If these same voters had known that such funds could be spent for any other purpose, it is doubtful, in the light of the rejection by the people of other income tax measures, that this one would have received approval. The people at that time were heavily burdened with taxes and were adverse to ''just another tax''. In my opinion, the people were justified in believing that these funds—and not just a part thereof—would be used to relieve them of property tax burdens.

If there could be any doubt concerning the application of these surplus funds, it seems to me it was removed by the enactment of chapter 447, Oregon Laws, 1947. In that year the legislature was confronted with a serious financial problem. It, of course, knew of the millions in the ''surplus fund''. Is it not reasonable to assume that the legislature would have used these surplus funds for general governmental purposes, if it believed it had the right to do so? No, the legislature knew that these special purpose funds could only be used for tax relief purposes. It kept the faith and abided by the constitutional mandate (Art. IX, sec-

tion 3 of the Oregon Constitution) that "every law imposing a tax shall state distinctly the object of the same to which only it shall be applied." The legislature will no doubt be surprised to learn—in view of this court's decision—that it had, for many years, been "looking through glasses darkly", and that these special purpose funds could be diverted as it saw fit.

The 1947 Act provides, in substance, that the Tax Commission shall make a finding as to the sufficiency of available revenues within the six per cent limitation to meet appropriation requirements for the fiscal year beginning July 1, 1948; that, if such revenues, *plus estimated miscellaneous receipts,* are insufficient for that purpose, the Tax Commission shall certify that fact to the Secretary of State, who shall refer to the people the question whether a levy in excess of the six per cent limitation shall be made, and, if such levy is so approved by the people, it shall, in the language of section 4 of the Act, *"be offset, as are other state taxes, by funds derived from taxes on or measured by net income."* Is it not plain, from this last legislative enactment, that such surplus funds were dedicated to a special purpose? Did not the legislature thus recognize the special-purpose character of the fund in question? Certainly such surplus funds could not be offset against a levy and at the same time be considered as a part of "miscellaneous receipts", as the Tax Commission now contends. What did the legislature have in mind in anticipating a "levy deficiency"? If the legislature had considered the surplus available for general governmental purposes, there could have been no deficiency, and it would have been a vain and idle thing to have provided therefor. The majority opinion fails to attach any significance to this 1947 Act, and makes no attempt to explain the purpose of the legislature,

in enacting the same. In my opinion, this Act clearly establishes that the legislature understood and treated this surplus fund as available only for tax relief purposes. The Act stands as an insurmountable wall in the face of the majority opinion. Yet, in the majority opinion, referring to the 1947 Act, it is said:

" * * * But there seems no reason expressed in the statute why the untransferred surplus in 1947 should not be deducted along with other miscellaneous receipts (the $6,000,000 item) above the line, so that no deficit of $5,800,000 would appear and no tax levy be required."

Clearly, the 1947 Act is not unconstitutional. No unlawful delegation of legislative authority to the Tax Commission is involved. It is proper for the legislature to anticipate a condition likely to arise in the future and to provide for the contingency. *Marr v. Fisher*, 182 Or. 383, 187 P. (2d) 966, and authorities therein cited.

The Tax Commission—based upon an opinion of the Attorney General rendered February 13, 1948,—refused to certify to the Secretary of State the necessity of a tax levy, as it considered the surplus funds available for general governmental purposes. Hence, the basic question was raised as to whether such surplus could only be used for tax relief purposes, or whether it was available for general governmental purposes. If the surplus was available for general governmental purposes, then it follows that there would have been no deficiency and hence no necessity for certifying a levy by the Tax Commission.

The proposed diversion violates the Tax Commission's own administrative construction and application of the "Property Tax Relief Act of 1929". Here-

tofore, the Commission has consistently held that property tax relief funds can be applied only to reduce taxes on property, as shown by the excerpts from its Biennial Reports set forth in the dissenting opinion of Chief Justice Rossman. These Reports—of which the court may take judicial notice—are entitled to weight in construing the Act. *Kelsey v. Norblad,* 136 Or. 76, 298 P. 199; *Eugene School Dist. No. 4 v. Fisk,* 159 Or. 245, 79 P. (2d) 262; *State ex rel. Galloway v. Watson,* 167 Or. 403, 118 P. (2d) 107.

This construction by the Tax Commission of the "Property Tax Relief Act" throughout the years was in accord with the opinion of the Attorney General rendered in May, 1945 (Opinions of Attorney General, 1944-1946, p. 172), wherein it was said:

"All revenues in the state school support fund are derived from taxes on or measured by net income. The laws imposing the tax from which such revenues are derived distinctly state in each instance that the purpose of the tax is to reduce ad valorem taxes on property. Such revenues can be applied to no other purpose. Section 3, Article IX, Oregon constitution."

Of the nineteen levies made since the property relief program was enacted in 1929, thirteen were made when there were actual surpluses in collections over applications of property tax relief revenues. This is the first time that the Tax Commission has undertaken to apply such surplus funds contrary to its well established practice. In my opinion, the exigencies of the situation do not warrant diversion of funds created for the special purpose of property tax relief.

If the Tax Commission's present position is correct, viz., that these surplus funds can be considered as a part of "miscellaneous receipts", then every one of the

last eighteen state tax levies, beginning with the levy for 1931, has been erroneously prepared, and each legislature during that period has suffered the alleged abuse without correction.

It is urged as a reason for diverting the surplus funds that the tax revenues are today in excess of those needed for tax relief purposes. The fallacy in such argument lies in the assumption that the legislature intended to use such surplus regardless of the uncertainties of tomorrow. It is common knowledge that income tax collections and operating expenses of government fluctuate with economic conditions. How can we reasonably assume that income tax collections will meet the requirements of future expanded tax relief enactments? It is a false assumption that property tax relief has been fully accomplished with an undedicated surplus left over. Can it be that the legislature has completed its task of granting property tax relief? Are there no other taxes against which this surplus fund can be offset?

No amendment of the "disposition section" (37) of the "Property Tax Relief Act of 1929" discloses any intention of the legislature to authorize the "surplus fund", or any part thereof, to be used for any purpose other than property tax relief. If it be argued that chapter 466, Laws of Oregon, 1947, indicates an intention to the contrary, then I submit that, under such construction of the amendment, it would be null and void, since it would not be germane to the purpose of the original enactment. Art. IV, section 20 of the Oregon Constitution. As heretofore stated, the title of the 1929 Act clearly and definitely expresses the purpose of such legislative enactment. It is to provide "Property Tax Relief". As stated in *State ex rel.*

*Umatilla County v. Hawks,* 110 Or. 497, 509, 222 P. 1071:

> " * * * Provisions of an amendatory act which are beyond the scope of the title of the act amended, and for that reason would have been void if they had been embraced in the earlier act, are likewise void when incorporated in the amendatory act * * *."

The authorization by this court for the legislature to spend this surplus fund marks the end of a wholesome tax relief program, inaugurated by the legislature in 1929. It also marks the dawn of a new tax-spending day.

For these reasons, briefly stated, I respectfully dissent.

Submitted on rehearing August 11, 1948.

*Roy F. Shields* and *William E. Dougherty,* of Portland, argued the cause for appellant. On the brief were Roy F. Shields, James G. Smith, William E. Dougherty, and Maguire, Shields, Morrison & Bailey, all of Portland.

*George Neuner,* Attorney General, and *Dean Ellis,* Assistant Attorney General, of Salem, argued the cause and filed a brief for respondents.

Before ROSSMAN, Chief Justice, and LUSK, BELT, KELLY, BAILEY, BRAND and HAY, Justices.

ROSSMAN, C. J.

This is an appeal by the plaintiff from a decree of the circuit court in favor of the defendants, which was

entered after the court had overruled a motion made by the plaintiff for the entry of a decree in his favor on the pleadings and had sustained a similar motion of the defendants for the entry of a decree in their favor. The plaintiff is a taxpayer. The defendants are the members of the State Tax Commission (§ 110-501, O. C. L. A.). Succinctly stated, the purpose of the suit is to require the defendants to comply with Oregon Laws 1947, chapter 477.

The prayer of the complaint seeks (a) a prohibitory injunction restraining the defendants from applying in the state tax levy for the fiscal year 1948-1949 any revenue yielded by the Personal Income Tax Act (§ 110-1601 to § 110-1638, O. C. L. A.) and by the Corporation Excise Tax Act (§ 110-1501 to § 110-1527, O. C. L. A.) except to reduce or offset property taxes; (b) a mandatory injunction requiring the defendants to make the findings and issue the certificate delineated in Oregon Laws 1947, chapter 477, § 2; (c) a mandatory injunction requiring the defendants, in preparing the state tax levy for the fiscal year 1948-1949, to deem as the tax base (Art. XI, § 11, Constitution of Oregon) the sum of $7,137,671.51.

The assignments of error are predicated upon contentions that the court erred in entering its decree and in failing to grant the relief sought by the prayer.

Although the attacked decree is based upon the pleadings, we deem it unnecessary to set forth a review of the latter. Apart from challenging the construction and applicability of Oregon Laws 1947, chapters 439, 466 and 477, the defendants otherwise concede the duties which our laws impose upon them. The plaintiff does not impugn the motives and fidelity

to duty of the defendants. The sole issue between the parties is the construction and application of those laws.

Chapter 439, Oregon Laws 1947, is an amendment to the disposition section of our Corporation Excise Tax Act, and chapter 466 is an amendment to the disposition section of our Personal Income Tax Act. By the term "disposition section" we mean the part of the act which specifies the disposition which shall be made by the defendants of the revenue produced by the act.

Chapters 439 and 466 which are, respectively, amendments to the excise tax act and the personal income tax act adopted in 1929, contain virtually the same language. Each of those acts at the time of its adoption set forth in its disposition section this provision:

"It is the expressed intention of this act that the revenue derived from the tax shall reduce by corresponding amount the direct tax levy which the tax commission would otherwise apportion to the several counties of the state."

The excise tax act was chapter 427, General Laws of Oregon 1929, and the income tax act was chapter 448 of the same compilation. The title of the act last mentioned began thus:

"Providing for property tax relief by the levying, collecting and paying of taxes on incomes; * * * *"

The title of the excise tax act contained no similar statement. The first section of chapter 448 follows:

"This act shall be known and cited as the 'Property Tax Relief Act of 1929.' "

We shall hereafter refer to it under that title although we shall omit "of 1929". The act just mentioned imposes a tax upon personal income. The other act secures its revenue from corporation income. Apart from the differences of which we have taken notice, the two acts are sufficiently similar so that the parties deal with them as though they were one. We shall do likewise. Both acts have been amended several times since their enactment in 1929.

■ Section 110-533, O. C. L. A., as amended by Oregon Laws 1941, chapter 440, renders it the duty of the tax commission, of which the defendants are the members, annually in July to determine the amount of revenue which the state will need for the year ahead and after having done so apportion the total among the counties. Section 110-534, as amended by Oregon Laws 1941, chapter 440, states the manner in which the commission must determine the state's needs. That section of our laws is basic in the delineation of the duties of the defendant commission. It is divided into five subsections, the first of which directs the commission to "prepare a tabulated statement, consisting of all the items of expense * * * to which the state will be subject under existing laws for the fiscal year * * *." Since there is no controversy concerning the items which must be included as "items of expense", we will quote that subsection no further, but will go on to the second subdivision, which says:

"From the sum total of the aforesaid items shall be deducted any surplus or estimated surplus remaining in the state treasury from all funds, however derived, if not applied by law to some special purpose."

It is the words "not applied by law to some special

purpose" which is largely the battleground of this suit.

The third subdivision of § 110-534 says:

"The remainder so obtained shall be the total amount of revenue to be raised for state purposes for the current fiscal year, and such remainder shall be apportioned among the several counties in the manner hereinafter provided."

It will be observed that the provision starts with the words "The remainder". "The remainder" is the state tax levy (*School District No. 1, Multnomah County v. Bingham,* 174 Or. 540, 149 P. 2d 963), provided it does not exceed the sum permitted by Article XI, § 11, Constitution of Oregon, which we shall later consider. We deem important the fact that "the remainder" is the state tax levy, and shall have occasion to mention the matter again.

As we shall presently show, the defendant commission, since the enactment of these two tax acts and until about five months ago, regarded the revenue produced by the acts as "applied by law to some special purpose" and, therefore, did not make the deductions "from the sum total" mentioned in the language quoted from the second subsection of § 110-534. The deduction was made by the commission from the state tax levy. The "special purpose" to which the commission deemed the revenue yielded by the two acts "applied by law" was property tax relief. Such being its belief, it made the deduction from the tax levy and certified to the counties for collection only the balance. The agency did not view the taxes imposed by the two tax acts as additional sources of revenue for the avail of the state's general expenditures, but as substitutes, partial or complete, for the revenue which the tax on

property would otherwise have been compelled to produce.

Article XI, § 11, Constitution of Oregon, says:

"Unless specifically authorized by a majority of the legal voters voting upon the question neither the state nor any * * * body to which the power to levy a tax shall have been delegated shall in any year so exercise that power as to raise a greater amount of revenue for purposes other than the payment of bonded indebtedness or interest thereon than the total amount levied by it in any one of the three years immediately preceding for purposes other than the payment of bonded indebtedness or interest thereon plus 6 per centum thereof; * * *."

We direct attention to the words "levy a tax" which appear in the quoted language. It is upon the "levy" that the restrictive effect of the constitutional provision operates. The levy is the tax base. The latter term has come into current use as denoting the maximum amount upon which the six per cent increase authorized by Article XI, § 11, Oregon Constitution, operates. The point where the deduction of the revenue produced by these two acts is made is highly important, as we shall now show. If the deduction is made from "the sum total", as that term is employed in subsection 2 of § 110-534, O. C. L. A., previously quoted, the amount available for expenditures is expanded in the amount of the produced revenue, but the tax levy and the tax base are reduced to the same extent. In fact, if the produced revenue equals or exceeds "the sum total" (subsection 2 of § 110-534) there will be no need for a tax levy and, hence, in three consecutive years of such operation the state would lose its tax base. If the deduction is made from "the remainder" (subsection 3 of § 110-534), that is, from the tax levy, expenditures are subject

to whatever control is exerted by the aforementioned constitutional provision, and a tax levy is necessary, at least as a bookkeeping matter. As is stated in *School District No. 1, Multnomah County v. Bingham,* supra, the levy of a tax and the collection of the levied tax are distinct operations. Hence, if the deduction of the revenue produced by these two tax acts is made from ''the remainder'', the latter remains as the tax levy and the tax base. The deduction, in that event, from the tax levy is nothing else than a step in the collection of the tax. It is the application of money already collected for a specific purpose to the intended purpose. In that way the tax base is preserved.

Recently the commission acting upon the advice of the Attorney General, given February 13, 1948, signified a purpose to deem revenue produced by the two acts, or, at any rate, some which is now on hand, available for the discharge of the general obligations without a levy first taking place. After the commission had shown an intention to depart from its previous practice, the plaintiff instituted this suit. The issue is whether or not the revenue produced by the acts is ''applied by law to some special purpose. '' The plaintiff urges that it is; the defendants take the other view.

In our opinion, the issue is largely governed by chapters 439, 466 and 477, Oregon Laws 1947. In view of the fact that chapters 439 and 466 are virtually alike, we shall employ for our purpose chapter 466, and will refer to it as the 1947 disposition section. We now quote it (chapter 466):

''All costs incurred in the administration of this act shall be paid out of the revenue from the tax imposed by this act and the net revenue from the tax, after deduction of said administrative costs, shall become a part of the general fund in the hands

of the state treasurer. Such revenue, like that from other sources, shall be taken into account by the tax commission in making the annual levy for state purposes, but shall not affect the base for computing the limitation on such levy imposed by section 11, article XI, Oregon Constitution. It is the expressed intention of this act that the net revenue derived from this tax shall be applied first to reduce the state tax levy on property inside the 6 per cent constitutional limitation and then to reduce the state levy on the property outside said constitutional limitation. In the event that the revenue from this tax and the revenue from any other tax on or measured by net income for any fiscal year shall exceed the amount necessary to eliminate the state levy on property otherwise required to be paid into the state treasury by the several counties for such year, the remainder of such revenues shall be accounted in the state levy of taxes and applied as follows:

"(1) To reduce by corresponding amount the property tax otherwise to be apportioned to the several counties for the state elementary school fund, and the state treasurer hereby is directed to transfer such amount to an account in the general fund to be known as the state elementary school fund account. On or before October 15 of each fiscal year the secretary of state shall draw warrants on the state treasurer, payable to the treasurers of the several counties, for not less than one-half of the respective amounts apportioned in the state levy of taxes for payment from said state elementary school fund account; similarly, the secretary of state shall draw warrants on or before April 15 of such fiscal year covering the entire remainder of said account.

"(2) Next, from the remainder of such revenue, if any, the state treasurer shall transfer an amount not in excess of five million dollars ($5,000,000); provided, however, in each of the fiscal years 1945-1946 and 1946-1947 an amount not in excess of eight million dollars ($8,000,000) shall be so transferred

to a fund in the state treasury to be known as the state school support fund, for apportionment as provided by law in reduction of property taxes otherwise to be levied for the support of the public elementary and high schools.

"(3) Next, the remainder of such revenues, if any, in an amount not exceeding five million dollars ($5,000,000), the state treasurer shall transfer to an account in the general fund to be known as the property tax reduction account, to be applied in the state levy of taxes for the next ensuing fiscal year for the several purposes and in the order hereinbefore stated; provided, however, that in the event that that certain measure enacted by the forty-third legislative assembly of the state of Oregon, designated and introduced in such assembly as house bill No. 415 and which was referred to the people by said legislative assembly, shall not be approved by the people, then there shall be transferred to such account, in addition to the funds herein provided, in each of the fiscal years 1945-1946 and 1946-1947 the additional sum of five million dollars ($5,000,000).

"In the event that the amount in said property tax reduction account at the close of any fiscal year plus the estimated receipts from this tax and from any other tax on or measured by net income, as accounted in the state levy of taxes for the next ensuing fiscal year, shall exceed by not less than five million dollars ($5,000,000) the total amount required to offset all the aforesaid state taxes otherwise to be levied on property, including the tax for the state elementary school fund and the aforesaid transfer to the state school support fund for such fiscal year, together with the additional sums herein required to be transferred in each of the fiscal years 1945-1946 and 1946-1947 to the property tax reduction account, then the state treasurer shall transfer to a fund in the state treasury to be known as the state and county school fund any excess over the amounts heretofore specified up to

an amount aggregating with other moneys in said fund, not more than ten dollars ($10) per capita for all children within the state between the ages of 4 and 20 years, as shown by the last preceding school census compiled and certified by the superintendent of public instruction, for apportionment as provided by law in reduction of property taxes otherwise to be levied for the county school funds of the several counties. In the event that at the end of any fiscal year, the estimated receipts from this tax and any other tax on or measured by net income, required to be accounted for in the state levy of taxes for the ensuing fiscal year, shall exceed the aggregate of the amounts hereinbefore required to be transferred or accounted for, there shall be allowed upon tax returns for tax years beginning in the calendar year during which such excess is determined a discount of 5 per cent for each one million dollars excess or major part thereof; provided that in the case of fractional years, the discount shall be applied to the 12 months succeeding the beginning of the first such fractional year; and further provided, that no discount shall be determined for the calendar year 1947 or the calendar year 1948 or for fiscal years beginning within each of said calendar years."

The commission's brief, in endeavoring to support the construction which it recently placed upon chapter 466, repeatedly refers to the disposition section of the property tax relief act as adopted in 1929. The extended arguments about the 1929 disposition section appear to us as being a battle within a grave, for virtually all of the 1929 disposition section has been carried away by the erosion of amendment. As originally adopted (see chapter 448, § 37, General Laws of Oregon, 1929), the section read:

"* * * The proceeds of this tax, like that from other miscellaneous sources, shall be taken account of by the tax commission in making the annual levy

for state purposes. It is the expressed intention of this act that the revenue derived from the tax shall reduce by corresponding amount the direct tax levy which the tax commission would otherwise apportion to the several counties of the state. In December, 1929, or the first year for which this act shall become operative, and for every year thereafter, the commission shall estimate the total amount of revenue to be raised under the several millage taxes in force and the amount necessary for miscellaneous state purposes as enumerated under section 4215, Oregon Laws; and shall deduct therefrom any surplus or estimated surplus remaining in the state treasury from all funds, however derived, and also the estimated net proceeds of this tax for the next ensuing calendar year. Only the remainder left after subtracting said surplus and the estimated receipts of this tax shall be apportioned among the several counties as provided by law.''

In its brief the commission concedes that, beginning with 1929 and continuing until five months ago, it interpreted the excise tax act and the property tax relief act as meaning that the revenue which they produced was devoted by law to a special purpose and that it was not available for general disbursement. The brief argues, however, that the repeated interpretations were erroneous. After the brief has reviewed the disposition section of an act which preceded the present one, it says:

''The court may well ask—why, if the original distribution provisions of the law were so clear in treating income tax collections as a part of miscellaneous receipts, did the tax commission follow a different computation in its levies beginning with 1930? Those levies were, of course, the responsibility of a differently constituted commission and should not bind the present commission; nevertheless, the court is justified in asking—'why?' ''

We shall later give the defendants' explanation.

By reverting to our quotation of the 1929 disposition section it will be seen that it includes the phrase, ''The proceeds of this tax, like that from other miscellaneous sources, * * *.'' The quotation which we made from the commission's brief which speaks of ''miscellaneous receipts'' refers to the words in the 1929 disposition section which we quoted. The 1943 legislative assembly eliminated from the section the word ''miscellaneous''. Oregon Laws 1943, chapter 441, § 1.

Frequently courts derive help in the construction of statutes by taking note of their history and antecedents. We shall, therefore, go back to the beginning of the state's experience with income tax legislation. In so doing, we shall pay attention to the commission's interpretation of our first income tax statute and the reasons which prompted the interpretation.

As early as 1923 an income tax act was adopted by this state: Chapter 279, General Laws of Oregon 1923. In the eighth biennial report of the defendant commission (1923-1924), page 12, is set forth the reasons which prompted the enactment of the 1923 act. It is there said:

''Oregon is tax valued at only a little more than one billion dollars. The needs of the various governmental functions throughout the State necessitate an annual tax levy of more than forty million dollars. This means over four per cent annually for taxes, a rate greater than property should be required to bear. A means had long been sought to lessen this burden and attempts at income tax legislation were made during different sessions of the legislature, including the regular 1919 session, the special session of 1920 and the regular session of 1921, but that method of taxation did not become a reality until the enactment of house bill No. 350 by the thirty-second legislature. This act, known as chapter 279, General Laws of Oregon, was referred to the

people and approved by them at the special election of November 6, 1923, and became effective as of January 1, 1923.''

At an election held in November, 1924, the act was repealed. The 1927 legislative assembly referred to the people for approval or rejection chapter 129, Oregon Laws 1927, which was another income tax act. The voters rejected it. Then came the act now before us.

 . The 1929 act was part of a comprehensive program for solving the taxation problem. Companion measures to the property tax relief act were the excise tax act and the intangibles tax act. In addition to those measures, the 1929 legislative assembly remade the tax commission and conferred additional duties and powers upon it. The commission's eleventh biennial report (1929-1930) to the legislative assembly dwelt at length upon the state's tax laws. One chapter of the report which was headed Property Tax Relief, said:

"So much has been said in support of the popular view that real estate is heavily overburdened under the general property tax that it would appear unnecessary to emphasize the urgent need of property tax relief. Evidence clearly indicates that state and local taxes have grown into a burden on real estate entirely disproportionate to its value or income.

"Sentiment in favor of tax relief for real property has been practically unanimous but the means of affording such relief has developed a wide diversity of opinion. * * * Obviously, if real estate is heavily overloaded under the general property tax, as the facts clearly indicate, the only practical remedy involves the shifting of a part of the load to broader shoulders. There can be no other logical solution.''

The foregoing statements were followed by chapters devoted specifically to the excise tax and the property tax relief acts.

As we have already said, the tax commission, in administering the 1929 property tax relief act, deemed that its revenue was assigned to a special purpose. It took the same position in regard to the excise tax act. The following quotation, taken from the commission's brief, brings into sharp contrast the construction placed by the commission upon the newly adopted 1929 act as distinguished from the construction which the previous commission had placed upon the 1923 act:

"The method followed by the commission under the 1923 law was to add income tax collections to miscellaneous receipts from other sources, deducting the total from the requirements of the state, leaving only the balance as the amount to be levied for state purposes. This procedure was entirely in accord with the distribution proceeding of the 1923 and the 1929 laws. The language of those laws is so clear that it is difficult to understand at the present time why the commission changed its levy practice following the 1929 law."

It will be observed that the commission's construction of the 1929 act was manifested, not only in its biennial reports, but also by entries and deductions which it made annually in determining the state's tax levy.

By reverting to our synopsis of § 110-534, O. C. L. A., one will see that subdivision 2 of that section says that "from the sum total of the aforesaid items," that is, of expenses, "shall be deducted any surplus * * * remaining in the state treasury from all funds, however derived, if not applied by law to some special purpose." It was at that point that the commission which administered the 1923 act made the deduction.

But the commission which went into office when the 1929 act was adopted made the deduction from the state tax levy; that is, from "the remainder" as that term is used in subdivision 3 of § 110-534, O. C. L. A. The point of deduction, as is shown in a previous paragraph of this opinion, is vitally important because it not only affects the total of permissible expenditures, but determines (a) the state's tax levy, and (b) the state's tax base. The new commission, unlike its predecessor, regarded the revenue yielded by the two tax acts as special purpose money, available only for the reduction of the levy. The present commission, after having proceeded since 1929 in the manner just indicated, now wishes to abandon its practice and embrace the course which its predecessor pursued in administering the short-lived 1923 act.

The part of the brief filed by the commission which we shall now quote recites facts which, according to the plaintiff, indicate in part why the new commission adopted the construction which it embraced in its administration of the 1929 act:

"The legislature in wording the original 1929 income tax law had in mind not only the practical effects of the language used in the law but, equally important, the certainty or near certainty that the act would be subject to a referendum. This referendum did occur. Thus, it was important that the voters be advised in simple language of the legal effect accomplished by paying the proceeds of the income tax into the general fund to be used 'like that from other miscellaneous sources' by the tax commission in making 'the annual levy for state purposes.' That language would have meant nothing to the average voter as to the property tax relief resulting to him; therefore, the legislature added: 'It is the expressed intention of this act that the

> revenue derived from the tax shall reduce by a corresponding amount the direct tax levy which the tax commission would otherwise apportion to the several counties of the state.''

Equally persuasive with the new commission, as we shall presently show by quotation from its brief, was the danger to the state's tax base if the commission continued the practice inaugurated by its predecessor of making the deduction from ''the sum total (subsection 2 of § 110-534, O. C. L. A.). The commissioners saw that if they continued their predecessors' course, the tax base might vanish and the state have no means of raising revenue if these tax acts were repealed or if they brought in a dwindling amount of revenue.

The opinions previously announced in this case bestowed attention upon the construction given to the 1929 act by the defendant commission, and in one of the dissenting opinions some sentences taken from several of the commission's biennial reports are quoted. Those interpretations, of course, concerned the original act. We are now confronted, not with the original disposition section, but with the 1947 section. We, however, deem the repeated interpretations as important, not only because the commission's brief frequently bases argument upon the 1929 disposition section, but also because the interpretation of that section may have influenced those who wrote the 1947 section. The commission, of course, concedes that its reports contain the statements just mentioned, and likewise admits that its previous interpretations of the act are adverse to its present position. Its brief says:

> ''The tax commission cannot help but be embarrassed at the 'dicta' quoted from its biennial reports to the legislature.''

Were we now called upon to construe the 1929 disposition section, it would be important for us to determine whether the commission's interpretation of the section is correct. But, we are not required to do so. The important fact now is the circumstance that for nineteen years the commission, in obedience to statutory requirements, placed before the legislature its interpretation of the disposition section, and the legislature, far from rejecting that interpretation, based future legislation upon it.

The biennial reports show that the commission deemed the revenue produced by these tax acts as special purpose money, available for the discharge of the state's general obligations only after the obligations had been made the subject of a levy. One can readily infer, as we shall now show, that the legislature concurred in that view. Subdivision 10 of § 110-505, O. C. L. A., includes among the duties which the commission shall perform the following:

> "To report to the legislative assembly, at each regular session thereof * * * the proceedings of the commission, and such other matters of information concerning the public revenue as may be deemed of general interest."

The commission has faithfully performed that duty, and its biennial reports are worthy of attention by all who are concerned with the taxation problem. Subdivision 11 of the same section of our laws renders it the duty of the commission:

> "To recommend to the legislative assembly at each regular session thereof such amendments or modifications of the Constitution or laws as may seem proper or necessary * * *."

When the legislature received biennially the commission's reports in which was set forth, among other matters, the agency's construction of the disposition section, it made no amendments to the acts setting aside the commission's construction. To the contrary, the amendments which were adopted are readily susceptible to an interpretation that the legislature concurred in the agency's interpretation. For instance, Oregon Laws 1939, chapter 488, § 19, Oregon Laws 1943, chapter 441, § 1, Oregon Laws 1945, chapter 408, § 1, and Oregon Laws 1947, chapter 466, § 1, made important changes in the disposition section. In the form given to it by the 1939 amendment, the section read:

"It is the expressed intention of this act that the revenue derived from the tax shall reduce by corresponding amount the direct tax levy which the tax commission would otherwise apportion to the several counties of the state. Said proceeds shall be first applied to reduce the state tax levy on property inside the six per cent constitutional limitation, and the remainder of such proceeds, if any, shall then be applied to reduce the state levy on property outside said constitutional limitation, * * *. Should said proceeds in any year exceed the amount necessary to entirely eliminate the state levy on property otherwise required to be paid into the state treasury by the several counties, the excess shall be applied to reduce by corresponding amount the property taxes otherwise to be apportioned to the several counties for elementary school purposes * * *."

The foregoing is clear, specific language and states exactly where the deduction must be made. Nothing is left in doubt or subject to conjecture. The amendatory language seizes upon the entry in the commission's tabulated statement entitled State Tax Levy,

and says: "This is the place." Let us read once more the legislative mandate; it is: "* * * revenue derived from the tax shall reduce * * * the direct tax levy". Shortly it adds that the net income produced by the act "shall be applied to reduce the state tax levy." We have seen that the term "state tax levy" has a well-defined meaning, and that ever since 1930 the defendant agency, with the knowledge of the legislature, has made the deduction from the state tax levy. In short, the defendant agency, after coining that phrase, employed it in its tabulatory statement and made the deduction at that point. Thus the legislature, by adopting the 1939 amendment, approved the agency's practice and transmuted the practice into statutory form. It directed the agency to continue the course it had embraced.

We now leave the 1939 amendment. The 1943 session (Oregon Laws 1943, chapter 441), as we have already indicated, deleted the word "miscellaneous" from the second sentence of the disposition section. In addition, the 1943 amendment authorized the use of the revenue produced by these two tax acts to discharge additional obligations included in the state levy which the owner of property would otherwise have to meet. It retained the above-quoted language which we took from the 1939 amendment.

About a year after the 1943 legislative assembly adjourned, this court announced its decision in *School District No. 1, Multnomah County v. Bingham,* supra, wherein we interpreted the meaning of the term "tax levy" in precisely the same way as the defendant commission had been doing. The decision approved the action of the assessor of Multnomah County in subtracting from the levy the amount of money received by the district as its allocated share of the state school

fund. The latter is raised by the very taxes now under consideration. Thus, there was approved a procedure closely analogous to that pursued by the defendant commission.

About six months after the Bingham decision was rendered, the 1945 legislative assembly convened. It amended still further the disposition section but retained unimpaired the provisions which said that the revenue earned by the act "shall be applied first to reduce the state tax levy". We believe that we are warranted in assuming that the legislature was familiar with the Bingham decision, and, being familiar with it, acted in accordance with its holding. The 1945 amended section directed the use of revenue produced by this tax to defray additional charges which otherwise would have to be met with money secured by taxes upon property. We deem those provisions immaterial to the issues before us.

We now go on to the 1947 disposition section. A preceding paragraph of this opinion quotes it in full. It, and not its antecedents, controls this suit. Its predecessors are important only so far as they cast light upon the meaning of the 1947 section. And the important matter concerning the predecessors is not their actual phraseology but the interpretation which was placed upon them, for, after all, words are significant only so far as they impart ideas.

Now let us analyze the 1947 disposition section. By reverting to our quotation of it, it will be seen that its first sentence, after charging all revenue produced by the act with the cost of administration, assigns the balance to the state's general fund. A glance at the financial statement which appears at page 1191 et seq. of 1947 Oregon Laws shows that much of the money

in the general fund is carried in accounts. A subheading of the financial statement reads: "Receipts from following sources credited to General Fund and appropriated for specific purposes." Under that subheading we find this entry: "Property tax reduction account, state income taxes—$38,800,000.00." In that way the daily balances of the many accounts are rendered available for general disbursements. For all other purposes each account remains a separate unit.

We go on to the second sentence of the 1947 disposition section, which says:

"Such revenue, like that from other sources, shall be taken into account by the tax commission in making the annual levy for state purposes, but shall not affect the base for computing the limitation in such levy imposed by Section 11, Article XI, Oregon Constitution."

The quoted words beginning with "Such revenue" and ending with "state purposes" are the same as the similar clause in the 1929 disposition section, with the exception that the latter includes the word "miscellaneous" immediately preceding "sources". We are aware of no reason why the foregoing words, taken from the 1947 disposition section, should be interpreted less favorably to the plaintiff than their antecedent in the 1929 section. Further, they are general words which are shortly followed by specific words which delineate precisely what the legislature wished to be done.

We come now to the third sentence of the 1947 disposition section, which begins thus:

"It is the expressed intention of this act that the net revenue derived from this tax shall be applied first to reduce the state tax levy on property in-

side the 6 per cent constitutional limitation and then to reduce the state levy on the property * * *.''

The words which begin with ''It is'' and end with ''shall'', together with those mentioned in the preceding paragraph, are all that remain of the 1929 disposition clause.

It is manifest 'from the ''expressed intention'' sentence just quoted that that provision imposes upon the defendant commission the duty to reduce ''the state tax levy'' with so much of the net revenue produced by the act as is necessary for that purpose. The reduction must be made in ''the state tax levy'' and not in any other entry of the commission's tabulations.

We deem so significant the words of the 1947 act that the reduction must be made in ''the state tax levy'' that we will thrash over once more some facts which have already had our attention. Ever since the commission was reorganized in 1929 it has made the deduction in the tax levy. It will be remembered that a state tax levy, if it does not exceed the limitation invoked by Article XI, § 11, Oregon Constitution, is determinative of the tax base. The latter, of course, is the highest of three consecutive years. We have shown that the defendant commission, when faced with the ambiguous 1929 disposition clause, resolved doubts in favor of the preservation of an adequate tax base and, therefore, made the deduction, not from ''the sum total'' (subsection 2 of § 110-534, O. C. L. A.), but from the levy (subsection 3 of § 110-534, O. C. L. A.). In that way the commission accomplished two important purposes: (1) it employed the proceeds of this tax to the special purpose of property tax relief, and (2) preserved for the state an adequate and stabilized tax base. We have seen that as early as 1939 the legisla-

ture confirmed the course which the commission was taking. We now quote again from the commission's brief:

"It may be conceded at once that the legislature has from the inception of the income and excise tax laws, attempted to preserve the property tax base. Since 1939 when the particular saving language was omitted, the language of the distribution sections has carried the legislative assumption that the base had been preserved, and the language of the present law provides that the net revenue derived 'shall be applied first to reduce the state tax levy on property inside the 6 per cent constitutional limitation  *  *  *.'"

Reading on, we come to the paragraph which we already quoted and which suggests:

"The court may well ask—why, if the original distribution provisions of the law were so clear  *  *  *  did the commission follow a different computation  *  *  *?"

After that paragraph is the following:

"The purpose appears fairly obvious when considered in the light of the situation which existed at that time. Remembering the quick repeal by the people of the 1923 income tax law and the loss of tax base as a result of applications of income tax receipts to reduce the net levies for the several years that collections continued under that law, the legislature declared its emphatic desire in the concluding paragraph of the distribution sections of the 1929 acts that the tax base should not be lost in the event of the repeal of the acts. The declaration of this purpose, however, was in no way tied to the express direction requiring the commission to add income tax receipts to other miscellaneous receipts in arriving at the net amount to be apportioned among the several counties as a direct property

tax levy. The original commission therefore had to seek a bookkeeping method which would accomplish the desired use of income tax funds, and at the same time show a technical preservation of the existing tax base unreduced by income tax applications."

Continuing, the brief shows that in order to accomplish the double purpose of (1) using property tax relief money for property tax relief, and (2) retaining the tax base, the commission made the deduction from the tax levy.

In the Official Voters' Pamphlet (§ 81-2109, O. C. L. A., amended by Oregon Laws 1941, chapter 409) issued for the special election held June 22, 1945, appears the following:

"Under Oregon law, income tax revenues can be used for property tax reduction and for no other purpose. In order to make legal use of income tax revenues for this proposed building fund it is necessary to levy it as a property tax to be offset by income tax revenues, and a property tax, above the 6% limitation, can only be levied by a vote of the people. Members of the legislature gave this proposal almost unanimous approval.

"The bill further provides that in case this measure is not approved by the voters, this $10,000,000 of income tax revenues will be collected anyway, and held in surplus reserve."

This argument was signed by Senator Dean H. Walker, Representative Giles L. French and Representative Burt K. Snyder, who were authorized to present the matter to the voters on behalf of the legislature (Oregon Laws 1945, page 479).

There is before us a printed document, sixteen pages in length, prepared by the defendant commission and

entitled State Levy of Taxes for the Year 1947-1948. A perusal of it shows that the commission makes the deduction of the revenue produced by these two tax acts from the state tax levy, and that our delineation of the commission's practice is correct.

Without resort to further analysis, we express our conclusion that the 1947 disposition section directs the defendant commission to make the deduction of the net income yielded by the excise tax and the property tax relief acts from the state tax levy. In our analysis we have frequently mentioned the commission's practice. The latter we have deemed important only so far as it casts light upon the legislative meaning. We think that the meaning of the 1947 disposition section is clear.

Before analyzing other contentions concerning features of the 1947 disposition section, we shall take notice of Oregon Laws 1947, chapter 477, which reads:

"Section 1. Prior to July 1, 1948, the state budget director shall report to the board of control the expenditures under appropriations made by the 44th legislative assembly and his estimate of the requirements for expenditure during the remainder of the biennium ending June 30, 1949. The board of control shall review the report and make a determination as to the amount needed to meet necessary requirements and, in its discretion, certify that amount to the state tax commission.

"Section 2. At the time of making the apportionment of required state revenues for the fiscal year beginning July 1, 1948, the state tax commission shall make a finding as to whether or not the revenues available within the six per cent limitation imposed by section 11, article XI, of the constitution of Oregon, plus estimated miscellaneous receipts, are in an amount sufficient to meet the requirements of appropriations for which the commission is required to levy a tax, taking into account the

determination and certification by the board of control of the amount needed to meet requirements for expenditures during the remainder of the biennium ending June 30, 1949, and the items referred to in subsection 1 of section 110-534, O. C. L. A., as amended. If the commission finds that said revenues, plus estimated miscellaneous receipts, are insufficient therefor it shall certify to the secretary of state that, to meet said requirements as determined and certified by the board of control, a necessity exists for levying a tax in excess of the said constitutional limitation.

"Section 3. Upon certification by the tax commission to the secretary of state, he shall, in the manner provided by law, refer to the people of the state of Oregon, for their approval or rejection, the question of whether such levy in excess of the said limitation imposed by the constitution shall be made. In no event shall said proposed levy be in an amount in excess of $8,000,000. The secretary of state shall be and hereby is authorized and directed to set aside two pages in the official pamphlet containing measures referred to the people to be voted on at the next special or general election in which an argument in support of this act may be printed. A joint committee consisting of one senator to be appointed by the president of the senate and two representatives to be appointed by the speaker of the house shall prepare such argument and file the same with the secretary of state.

"Section 4. If the majority of the legal voters voting upon said question authorize such levy in excess of the limitations imposed by section 11, article XI, of the constitution, said levy shall be offset, as are other state taxes, by funds derived from taxes on or measured by net income.

"Section 5. If, upon making its estimate for the fiscal year beginning July 1, 1949, the state tax commission shall find that the amount so levied is not needed, taking into consideration unexpended

balances of appropriations, the levy shall not be made."

Briefly stated, and omitting details, section 1 of the above act requires the preparation for the period ending June 30, 1949, of a statement showing all contemplated expenditures. Section 2 renders it the duty of the defendant commission to enter a finding as to whether revenue available within Article XI, § 11, Oregon Constitution, "plus estimated miscellaneous receipts" will meet the contemplated expenditures. When this work has been done, the state possesses a current balance sheet. If the latter shows that a deficit will be incurred, a further provision of section 2 directs the commission to certify to the secretary of state that "a necessity exists for levying a tax in excess of the said constitutional limitation." Section 3 authorizes the secretary of state, upon receipt of the certificate, to refer to the people for their approval or rejection the issue as to whether a levy shall be made to meet the deficit. According to section 4, the commission must, if a deficiency levy is favored by the voters, offset the levy "by funds derived from taxes on or measured by net income."

It is manifest from the above that money on hand and produced by either of these two tax acts was not deemed by the legislature as "miscellaneous receipts." The act directs that if a deficiency levy is authorized by the voters, the income tax money must be used to offset the levy. Hence, the legislature in adopting chapter 477 made it clear that income tax money is special purpose money available only to offset tax levies. Obviously, income tax money on hand can not be counted twice—once as miscellaneous receipts, and a second time as offset money. If counted as miscel-

laneous receipts, there would be no deficit, no need for a deficiency certificate and no need for an election. It goes without saying that chapter 477 authorizes income tax money to be counted and used only once. It can be used only after a levy has been made. Its use is confined to a reduction or offsetting of the levy.

■ We now return to the 1947 disposition section. The defendant commission argues that a surplus in the general fund created by this tax act must be deducted from "the sum total" of expenditures (subsection 2 of § 110-534, O. C. L. A.), and not from the tax levy. By reverting to our quotation of the 1947 disposition section, it will be observed that it nowhere uses the word "surplus". If the legislature, in writing that law, intended that any revenue produced by our income tax statute should be regarded as surplus, it did not so indicate. To the contrary, by constantly employing the term "account" in reference to the revenue produced by the act, it seems manifest that the legislature had no thought of deeming any part of the revenue as surplus. Moreover, the 1947 disposition section includes among its provisions a clause whereby those who will file returns in 1949 and other future years will pay less than was paid this year, if the account possesses an excess after all charges against it have been defrayed. The reduction in the tax will be at the rate of five per cent for each one million dollars in the excess. It is, therefore, seen that if at the end of the current fiscal year the account possesses an excess, the discount will go into effect automatically and next year's income taxpayers will pay less. If the excess is sufficiently large, they will pay nothing. The curtailed returns will, of course, diminish the account. Their lessened amount, together with authorized appropriations, may

cause the account to vanish, with the exception of the five million dollar nest egg for which the disposition clause makes provision. We know of no reason to believe that the legislature was thinking of a surplus when it wrote the 1947 disposition section. It is true that it made provision for a possible excess, but it used the latter as the basis for graduating the rate of taxation upon future returns. Clearly, it intended the excess to remain in the account, for if it was disbursed by the defendants it would not be available for (1) lowering the rate upon next year's returns, and (2) taking the place of the future curtailed revenue. Thus, we see that the legislature has put to use every dollar in the account and has not deemed a single penny as surplus. Whenever there is no excess, the rate fixed in 1929 governs; if there is an excess, it remains in the account, but the rate is lowered. Whether or not there was a surplus in some bygone year is immaterial. We are concerned only with the facts as they appear today from the record placed before us by the parties.

In short, our conclusion is that the net income produced by these two tax acts must be deducted from the state tax levy. The latter, if not violative of Article XI, § 11, Constitution of Oregon, is the state tax base.

The question remains whether Article XI, § 11, Oregon Constitution, authorizes the course which Oregon Laws 1947, chapter 477, § 3, directs the secretary of state to take upon his receipt of a deficiency certificate issued by the commission after it has found that a deficit will be incurred. It will be recalled that chapter 477, § 3, says that the secretary of state, upon receipt of the certificate, shall "refer to the people * * * for their approval or rejection, the question of whether such levy * * * shall be made." If the people vote in

favor of the levy, chapter 477 does not contemplate that the levy will be collected from the taxpayers. The levy will be met by a transfer of ''funds derived (previously) from taxes on or measured by net income.'' The words just quoted, with the exception of the one in parenthesis, were taken from section 4 of chapter 477. Article XI, § 11, Oregon Constitution, authorizes deficiency elections ''to raise'' revenue. The question is whether or not the word ''raise'' authorizes a submission to the voters of a deficiency levy, which, if favored by the majority, will be offset by money already on hand.

The word ''raise'' has an extensive connotation, as is indicated in the Oxford Dictionary. The twenty-fifth definition of that word given in that great lexicon is:

''To levy (a tax, etc.); to collect (rents or other charges); hence, to bring together, obtain, procure by means of collecting or in any other way.''

The above is continued with the following illustrations:

''1821 Byron, *Juan* 111, XIV, Let not his mode of raising cash seem strange. 1852 Thackeray, *Esmond* 1, XIV. The correspondence related to a new loan my lord was raising. 1875 W. S. Gilbert, *Tom Cobb* 1, Me so pinched for money till I can hardly raise an egg for breakfast.''

From 52 C. J., page 794, we quote:

''Applied to money, 'to raise,' in its ordinary sense, means to bring together, to collect, to get together, to levy, to procure, or to realize a supply of money by some of various allowable methods, such as by loan, sale, subscription, or taxation.''

*Frost v. Hoar* (N. H.), 160 Atl. 51, which concerned municipal law, quoted from *Childs v. Hillsborough*

*Electric Light & Power Company,* 70 N. H. 318, 324, 47, Atl. 271, 272, the following:

> "To 'raise' money, as the word is ordinarily understood, is to collect or procure a supply of money for use."

In *New York & R. Cement Co. v. Keator,* 71 N. Y. S. 185, 62 App. Div. 577, the court said:

> "To 'raise money,' in its ordinary import, is simply to procure it. When applied to an individual or a business corporation, it means the procuring of money in any of the usual methods,—by note, mortgage, or other obligation. As applied to municipal corporations, its ordinary import is the procuring of money by taxation or by the obligations of the corporation."

From *Hand v. Stapleton,* 140 Ala. 555, 37 So. 362, we quote:

> "It is provided in the seventh that the cost as to the county should be allowed by orders on the county treasury, provided that the amount 'is on hand and can be raised by said county without increasing the present tax rate.' And the same proviso is, in effect, found in the tenth, which makes the condition on which the act is to go into effect to rest upon the ascertainment that the county contribution would not require an increase of the present tax rate 'to pay the same.' 'Raising money' contemplates a sale of property for money, or a borrowing on engagements to pay in the future. The legislature well knew that the county had no property to sell, and therefore, in authorizing payments to be made with money on hand or raised, must have had reference to payments out of revenue of subsequent years, arising without any increase of the tax rate, especially as the contribution that could be made for 1901 was to be certified as a preliminary proceeding. The transfer or delivery of the warrants falling due for subsequent years to the contractor, as cash, is the

same as if they had been sold, and the money raised thereby, and then paid to the contractor.''

■ It is, of course, obvious that the word ''raise'' as it appears in the constitutional provision under consideration, does not authorize the procurement of money by a loan, subscription, or the sale of property. Nevertheless, since the above-quoted definitions show that the word ''raise'' has a flexible meaning, they are not without significance.

■ We think that a favorable vote under Oregon Laws 1947, chapter 477, sections 3 and 4, accomplishes two purposes: (1) it authorizes a deficiency levy; and (2) it authorizes the collection of the needed money out of ''funds derived from taxes on or measured by net income.'' As we have seen, those funds are kept in a separate account and, as we have also seen, they are available only for the purpose of reducing or offsetting levies. A favorable vote enables the needed transfer or collection to take place. Accordingly, Article XI, § 11, authorizes the election for which chapter 477 makes provision.

The above disposes of all issues which we believe require our attention. We are satisfied that the circuit court erred when it entered the challenged decree. It should have overruled the motion made by the defendants and should have sustained the one presented by the plaintiff. The latter is entitled to the relief sought by his prayer.

The previous decision announced in this case is supplanted by this one. Our views are reflected by the foregoing.

LUSK, **BELT, KELLY and BAILEY, JJ., concur. LUSK, J., will file an opinion later.

---

** Belt, J., not present at oral argument, but participated in the rehearing and concurs in the foregoing opinion.

BRAND, J., dissenting:

The able opinion of the CHIEF JUSTICE presents all of the considerations which lead to a conclusion that the decree of the lower court should be reversed. Far greater weight is now given to the practical construction of the statutes by the Tax Commission and other state authorities than was accorded to it in the original opinion by the then majority of the court. In view of the confusion and inconsistencies appearing in the legislative enactments, I concede that it is proper to consider the practical construction which has been adopted by governmental agencies. I differ only as to the weight which should be given to such construction.

The opinion of the present majority fails, I think, to consider and explain the statutory provisions which were declared to be highly persuasive in the original opinion of the then majority. I refer specifically to the provisions relative to the cushion account and to those which place the income tax proceeds in the general fund and then make specific transfer in each instance to a special fund for property tax reduction, leaving a surplus untransferred. Obviously, it is impossible to harmonize all of the statutory provisions. Since the reconstituted majority now deems it necessary to adhere to the construction heretofore pursued by the Commission, I bow to its superior authority.

Two other matters merit brief comment. I agree that in any event the Bingham case should not be overruled and that under the express wording of the six per cent amendment it is the amount of the levy which determines the tax base and not the lesser amount which may be extended on the tax rolls. I am of the opinion that the legislature could provide for the

maintenance of an adequate tax base even if income tax surplus should be held to be "not applied by law to some special purpose". If in the next two years the surplus should be absorbed by the elimination of the deficit, by a rebate to income taxpayers, and (or) by a simple provision not now found in the statutes, that the surplus, if any, shall be placed in the cushion account for future property tax reduction, an adequate tax base could be established and assured. The surplus, having been disposed of or applied by statute to a specific purpose, a tax on property within the six per cent limitation could be levied and that levy be offset by income tax revenues if the legislature should so provide.

In conclusion, I fear that a laudable desire to reach a conclusion deemed by the majority to be required has resulted in a strained construction of simple language. Article XI, section 11 of the Constitution provides that unless specifically authorized by the voters, the state shall not so exercise the power of taxation as to raise a greater amount of revenue than the total amount levied (see Bingham case) in any one of the three years immediately preceding. Assuming, for the purpose of this discussion, that all income tax surplus is applied by law to a special purpose, the question remains, how can this court by mandamus require the Tax Commission to certify that "a necessity exists for levying a tax in excess of said constitutional limitation"? The question is, do the people *raise revenue* when they approve a levy against property, which, under the provisions of section 4, chapter 477, Laws of 1947, is never to be collected but is to be offset by income tax revenues? Such a vote in reality merely authorizes the use for a new purpose of income tax

revenues already raised, collected and in the possession of the state. If the meaning of the Constitution Article XI, section 11 had been considered under any circumstances other than those presently confronting us, I am confident that the court would have held that the provision which prohibits the state from so exercising "that power", i. e., the "power to levy a tax" "as to raise a greater amount of revenue", etc., without vote of the people, means raising revenue by means of taxation and has no application to a proposal to allocate funds already raised to a purpose assumed to be new.

It is within the clear power of the legislature to submit a tax levy to the voters whether the election be required by the six per cent amendment or not. But the legislature has not called an election. By chapter 477 it has merely directed administrative officers to call an election under certain conditions. It has directed the Tax Commission to ascertain certain facts, and if those facts are found, to make a certificate, and if the certificate is made, then the Secretary of State is to call an election. The authority of the Commission and of the Secretary of State is limited by the terms of the statute under which alone, action is authorized. If no certificate is made, the Secretary of State has no authority to call an election. The Tax Commission has refused to make the certificate. I submit that this court should not by mandamus require the Commission to certify that a necessity exists for the levying of a tax in excess of the six per cent limitation, when the tax if levied would raise no revenue but would, at most, merely authorize the transfer of funds, and when therefore no necessity exists for a popular election under the six per cent amendment. It must be remembered that the construction of constitutional provisions is a judicial and not a legislative function.

I recognize the force of the argument drawn from practical construction, and the scholarly presentation which has now convinced the majority of its validity. My views of the ultimate question are expressed in the original opinion. I regret that, as here indicated, I must dissent.

HAY, J., concurs in this dissent.

LUSK, J. (concurring).

One of the duties of the court, and in a sense one of its privileges, is to correct its own errors, once the court is convinced that error has been committed. To this end our rules provide for rehearings in appropriate cases so that contentions not advanced on the original submission may be made, arguments already pressed may be presented in a new light or with stronger emphasis and with greater persuasion, and fallacies in the reasoning of the court exposed. In the present case the petition for rehearing contains no contentions that may be said to be new, although fresh light has been thrown on some of the questions presented; and the petition, with the briefs and oral arguments in its support, does, in my opinion, clearly demonstrate that our opinion wrongly construed the legislation under consideration. That being so, as a member of the majority which rendered the original decision, there is no course open to me except to join in its correction.

The legislation is undoubtedly ambiguous and calls for judicial construction. If that were not so there would be no occasion and no warrant for resorting to administrative interpretation for aid in determining the legislative intent. The strongest argument for the view taken in the former majority opinion is that based

upon the failure of the legislature in Ch. 466, Oregon Laws, 1947, to make specific disposition of the so-called "surplus" income tax revenues. The fact that various sums were directed to be transferred from the general fund to special accounts, and particularly that an amount not exceeding $5,000,000.00 was directed to be transferred "to an account in the general fund to be known as the property tax reduction account", leaving the remaining revenues, already collected or estimated, apparently undisposed of otherwise than as "a part of the general fund in the hands of the state treasurer", constituted the basis of a valid argument that such remaining revenues had not been "applied by law to some special purpose."

But, in my judgment, upon more mature consideration, we gave too much weight to that argument. The failure of the legislature to dispose specifically and expressly of the "surplus" did indeed introduce an ambiguity into the law, but it should not be held to be the controlling factor in view of other provisions of Ch. 466, and in view of Ch. 477, Oregon Laws, 1947, and the administrative construction. I see no way of reconciling the conclusion reached in the former decision with the legislative mandate "that such revenue * * * shall not affect the base for computing the limitation on such levy imposed by section 11, Art. XI, Oregon constitution." It would be useless to attempt to add anything to the clear and cogent exposition in the opinion of the Chief Justice of the effect which should properly be given to the matters to which I have referred.

But I deem it worthwhile to comment at somewhat greater length on the case of *School District No. 1 v. Bingham,* 174 Or. 540, 149 P. (2d) 963, because it has a

bearing on the present case which to me at least was not apparent until the argument on rehearing. It was then called to our attention for the first time that the legislation involved in that case contained an express provision which should remove all doubt as to the legislative purpose that income tax revenues may be used only as an offset to a levy on property.

In the Bingham case the court was called upon to construe Ch. 439, Oregon Laws, 1943, which provided for the transfer of an amount not to exceed $5,000,000.00 "derived from taxes on or measured by net income" to the state school support fund to be apportioned to the several counties and thence to the public school districts. Section 1 of this act provides in part:

> "The amount received by each school district from this source in any year shall be fully applied to reduce the ad valorem property tax levied by the district for such year, as hereinafter provided, but shall not impair the tax base of the district under the limitation imposed by section 11, article XI, Oregon constitution."

In § 3 it is provided that "each county school superintendent shall determine and certify to the county assessor and to the county treasurer the amount to be paid for such year to each public school district of the county entitled to participate in the distribution of the county's apportionment of said fund". Section 4 reads as follows:

> "*The county assessor shall subtract from the tax levies of the several public school districts the respective amounts so certified by the county school superintendent, and shall extend on the assessment roll in each case no more than the remainder as the property tax levy of the district for the current fiscal year.* Immediately on extension of all such

tax levies, the county assessor shall certify to the county school superintendent and to the county treasurer the amounts of such levies as made by the several public school districts, the several amounts by which such levies were reduced under the provisions of this act and the respective remainders extended as the final property tax levies of such districts.'' (Italics added.)

The foregoing provisions—sustained in the Bingham case—delineate the procedure by which income tax moneys are to reduce the ad valorem property tax of the school districts and at the same time "not impair the tax base". This was to be accomplished by subtracting the amount of the income tax revenues from the district levy and extending only the remainder on the assessment roll—the very method which the Tax Commission insists it is not required to follow. The provisions of the income tax law in effect in 1943 as to preserving the state tax base and expressing the intention that income tax revenues should be applied to reduce the state tax levy on property, are identical with the provisions upon those subjects in the 1947 act. See, Oregon Laws, 1943, Ch. 441, § 1, and Oregon Laws, 1947, Ch. 466, § 1. And, so far as applicable, they are substantially identical with the comparable provisions of the 1943 act involved in the Bingham case quoted above. In that act the legislature spelled out in plain language how these two purposes of reducing the tax levy on property and maintaining the tax base were to be effected, and I think it cannot be assumed that the somewhat ambiguous language of the income tax law touching these matters means anything different from the explicit directions to the assessor in the school support law, or that the legislature intended that a different rule of property tax reduction through the

use of income tax revenues should apply to the tax commission than to county assessors.

The Bingham decision therefore is well-nigh controlling authority on the proposition that income tax revenues may be used only as a deduction from or offset against a levy on property.

Beyond that, the Bingham case determines the validity of the procedure authorized by Ch. 477, Oregon Laws, 1947—a question raised not by counsel but by members of this court, who doubted whether the levy of a tax which is never to be collected but is to be offset by income tax revenues is an exercise of "the power to levy a tax" within the meaning of Art. XI, § 11, Oregon Constitution. I shared those doubts, but have concluded that, to hold that the election provided for by Ch. 477 is not such an election as is contemplated by the constitutional amendment, would be contrary to the clear implications of the Bingham decision, which gives express approval to a tax levy that was never intended to be collected in a case involving the application of that amendment.

The petition for rehearing accurately says: "The basic issue in this case is not *where* the money should go as a matter of fiscal policy, but *who* is authorized as a matter of law to *decide* where it should go." This "basic issue" was obscured on the original presentation of the case by irrelevancies of which the case was stripped on the reargument.

It goes without saying that the only duty of the court is to ascertain the legislative intent from the language of the law, and when ascertained to give it effect. I am entirely satisfied that the decision now rendered is a proper discharge of that duty.